**FILED**

**DECEMBER 6, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**07 C 6894**

| | |
|---|---|
| ALVIN FIELDS,<br>    2430 Nan Street<br>    Aurora, IL 60605, | )<br>)<br>)<br>)<br>)<br>) |
| ALLEN CAMPBELL,<br>    1661 Solfisburg<br>    Aurora, IL 60505, | )<br>)<br>)<br>) |
| J.R. PRYOR, JR.,<br>    814 North View Street<br>    Aurora, IL 60506 | )<br>)<br>)<br>) |
| and, | )<br>) |
| ROBERT MOSBY<br>    603 Spring Street<br>    Aurora, IL 60505 | )<br>)<br>)<br>)<br>) |
| on behalf of themselves and others similarly situated, | )<br>) |
|                                    Plaintiffs,<br>         v. | )<br>)<br>) |
| | )<br>)<br>)<br>) |
| LYON WORKSPACE PRODUCTS, LLC,<br>LYON WORKSPACE PRODUCTS, LLC HOURLY<br>RETIREES HEALTH PLAN,<br>    P.O. Box 671<br>    Aurora, IL 60507, and | )<br>)<br>)<br>)<br>)<br>) |
| L & D GROUP, INC.<br>    420 North Main Street<br>    Montgomery, IL 60538, | )<br>)<br>)<br>)<br>) |
|                                    Defendants. | )<br>) |

**Civil Action No.** JUDGE LEFKOW
MAGISTRATE JUDGE SCHENKIER

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

COME NOW Plaintiffs Alvin Fields, Allen Campbell, J.R. Pryor, and Robert Mosby, and allege as follows:

**JURISDICTION AND VENUE**

1.   This is an action brought by Alvin Fields, Allen Campbell, J.R. Pryor, and Robert Mosby, retired employees of the Lyon Workspace Products manufacturing plant in Aurora, Illinois.  The named plaintiffs other than plaintiff Mosby bring this action on behalf of themselves.  All named plaintiffs other than plaintiff Mosby also bring this action on behalf of all other retirees similarly situated.  Plaintiffs seek to enforce the terms of the 2005 Insurance Agreement entered into between their collective bargaining representatives and defendant Lyon Workspace Products ("Lyon"), and to enforce Sections 404, 406, 409, and 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1104, 1106, 1109, and 1132(a), and Section 301 of the Labor Management Relations Act of 1947, as amended ("LMRA"), 29 U.S.C. § 185.  This action arises under the laws of the United States, specifically Section 502 of ERISA, 29 U.S.C. § 1132(a), and Section 301 of the LMRA, 29 U.S.C. § 185.  Jurisdiction is therefore conferred on this Court pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1); Section 301 of the LMRA, 29 U.S.C. § 185(a); and 28 U.S.C. § 1331 and § 1337.

2.   Lyon operates a manufacturing plant in Aurora, Illinois.  Lyon is a subsidiary of L & D Group, Inc., which owns 100% of its capital stock.  Lyon and, on information and belief, L & D Group, Inc. participate in the management and administration of the Lyon Workspace Products, LLC Hourly Retirees Health Plan ("Lyon Plan"), a collectively bargained employee benefit plan which has provided, and continues to provide, benefits to retirees in this District.  The cause of action arose substantially from Defendants' transaction of business in this District.

2

Venue therefore lies in this Court pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2); pursuant to 29 U.S.C. § 185(a); and pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3.  Alvin Fields resides at  2430 Nan Street, Aurora, Illinois, 60502.  Mr. Fields was employed by Lyon at the Aurora plant for approximately 45 years until he retired from the company in 2002.  While employed at Lyon, Mr. Fields was a member of USW Local 1636, United Steelworkers of America (currently known as "USW Local 1636").  Mr. Fields was eligible to participate, and did participate, in the Lyon Plan until approximately August 2007, when he no longer could afford the employee contributions demanded of him, and he was terminated from the Lyon Plan.

4.  J. R. Pryor, Jr. resides at 814 North View Street, Aurora, Illinois, 60506.  Mr. Pryor was employed by Lyon at the Aurora plant for approximately 40 years until he retired from the company in 2005  While employed at Lyon, Mr. Pryor was a member of USW Local 1636.  Mr. Pryor was eligible to participate, and did participate, in the Lyon Plan at no cost until June 2007, when he could not afford the employee contributions demanded of him, and he was terminated from the Lyon Plan.

5.  Allen Campbell resides at 1661 Solfisburg, Aurora, Illinois, 60505.  Mr. Campbell was employed by Lyon at the Aurora plant for 36 years until he retired from the company in 2001.  While employed at Lyon, Mr. Campbell was a member of USW Local 1636.  Mr. Campbell was eligible to participate, and did participate, in the Lyon Plan until June 2007, when he no longer could afford the employee contributions demanded of him, and he was terminated from the Lyon Plan.

6.   Robert Mosby resides at 603 Spring Street, Aurora, Illinois, 60505.  Mr. Mosby was employed by Lyon at the Aurora plant for over 40 years until he retired from the company in May 2007.  While employed at Lyon, Mr. Mosby was represented in collective bargaining by USW Local 1636.  An hourly retiree of Lyon, Mr. Mosby was eligible to participate in the Lyon Plan at no cost until April 2008.  Mr. Mosby did not participate in the Lyon Plan because Defendants required payment of contributions Mr. Mosby could not afford as a condition of joining and participating in the Lyon Plan.

7.   Defendant Lyon is a limited liability company with its principal place of business in Illinois.  It is the successor, by virtue of firm reorganizations, to Lyon Metal Products, Inc. and Lyon Metal Products, L.L.C.  Hereinafter all references to "Lyon" are to Lyon Workspace Products, L.L.C. and all of its predecessors and successors.  Defendant Lyon is the plan sponsor and plan administrator of the Lyon Plan.

8.   Defendant L & D Group, Inc. is a corporation with its principal place of business in Illinois.  It is the successor of a corporation known as the Lyon Holding Co., and has also been known as the Lyon & Dittrich Holding Company.  Defendant Lyon is a wholly owned subsidiary of L & D Group, Inc.  Hereinafter all references to "L & D Group" are to L & D Group, Inc., and any of L & D Group's predecessors or successors.  On information and belief, L & D Group also exercises discretion in the administration of the Lyon Plan.

9.   Defendant Lyon Plan provides, through a component "Program," the benefits to which the named plaintiffs and other eligible Lyon retirees are entitled.  Lyon Plan is an employee welfare benefit plan as defined by, and subject to, ERISA, 29 U.S.C. § 1002(1).  Its administrative offices are in Aurora, Illinois.

4

**FACTS**

10. Defendant Lyon has manufactured lockers, storage cabinets, and metal shelving at its Aurora plant since approximately 1901.  Defendant Lyon is an employer in an industry affecting interstate commerce and has been an employer of all the named plaintiffs.

11. Since before 1999, USW Local 1636 has served as the collective bargaining representative for most classifications of employees in hourly jobs in Lyon's Aurora plant.

12. Lyon and USW Local 1636 have entered into collective bargaining agreements regarding, *inter alia,* rates of pay, hours of work, conditions of employment, and job security at the Aurora plant.

13. Among the collective bargaining agreements that Lyon and USW Local 1636 have entered into are a series of "Insurance Agreements."  These agreements cover the terms of certain benefits – including *inter alia* medical and prescription drug benefits – provided by Lyon to current and retired bargaining unit employees represented by USW Local 1636.  The Insurance Agreements are agreements between an employer and a labor organization under LMRA § 301, 29 U.S.C. § 185.

14. The medical and prescription drug benefits promised to the plaintiffs and other retirees are provided in accordance with the Lyon Plan, an employee welfare benefit plan within the meaning of ERISA § 2, 29 U.S.C. § 1002, and through a component of the Lyon Plan that provided plan benefits to hourly retirees of Lyon, which is referred to as the "Program."  The medical and prescription drug benefits provided to participants through the Lyon Plan, including those provided through the Program, are "self funded."  In other words, the cost of the benefits was not guaranteed by insurance contracts purchased by the plan sponsor, but rather

benefits were to be paid by the plan directly, funded as necessary by the assets of the plan sponsor, Lyon.

15.  Lyon's ultimate financial obligation to pay for the Program benefits is not unlimited, but is subject to an aggregate cap, calculated each year, the precise formula for which was agreed to by the parties in the Insurance Agreements, and which is set out in the Program Summary Plan Description ("SPD").  Specifically, Section 7 of Article I of the Insurance Agreement dated March 6, 1994 ("the 1994 Insurance Agreement") obligated Lyon to provide medical insurance for all members of the bargaining unit represented by USW Local 1636 who were hired prior to February 15, 1988 and who retired on or after March 1, 1965.  In capping the company's financial obligations for retiree medical insurance, the 1994 Insurance Agreement states in relevant part:

> [T]he Company's Medical contribution for all currently eligible future Retirees (i.e., those hired prior to February 15, 1988) and their dependents and for all current Retirees and dependents who are covered by the program will be frozen as follows:  The total amount of benefits (for all Lyon Retirees) paid per calendar year beginning with 1994 is capped at $750,000,  However, the cap will be adjusted during each year by (1) adding $4,000 for each new retiree who enters the program, and (2) deducting $1,500 for each retiree life (retirees, spouse, or dependent) that leaves the program.  The adjusted cap will be compared with actual plan expenses at the end of the calendar year.  If claims exceed the adjusted cap, current Retirees will be expected to pay a pro rated monthly contribution.  In any year if actual Plan costs are less than the cap, there will be no contribution from Retirees and the Company shall not be required to pay more than the actual Plan costs or make any refunds.

(emphasis in original.)  *See* Exhibit A (1994 Insurance Agreement).

16. Lyon and USW Local 1636 re-negotiated the Insurance Agreement every three to four years.  Although the amounts to be added or subtracted from the adjusted cap when retirees enter or leave the Program have changed, the language regarding the existence of the cap, the calculation of the cap, the comparison of the adjusted cap with actual plan expenses at the end

of each calendar year, and the responsibility of participants who had participated in the Program in the prior year to make up on a pro rated basis that prior year's shortfall remained the same in subsequently negotiated Insurance Agreements.

17. Section 7 of Article I of the current version of the Insurance Agreement, effective February 20, 2005 ("2005 Insurance Agreement," attached hereto as Exhibit B), states:

> In addition, the Company's Medical contribution for all currently eligible future Retirees (i.e., those hired prior to February 15, 1988) and their dependents and for all current Retirees and dependents who are covered by the program will be frozen as follows:  The total amount of benefits (for all Lyon Retirees) paid per calendar year beginning with 1994 is capped at $750,000.  However, the cap will be adjusted during each year by (1) adding $4,750 (effective 2/17/01) for each new retiree who enters the program, and (2) deducting $1,250 (effective 2/17/01) for each retiree life (retirees, spouse, or dependent) that leaves the program.  The adjusted cap will be compared with actual plan expenses at the end of the calendar year.  If claims exceed the adjusted cap, current Retirees will be expected to pay a pro rated monthly contribution.  In any year if actual Plan costs are less than the cap, there will be no contribution from Retirees and the Company shall not be required to pay more than the actual Plan costs or make any refunds.  In the event that the Federal government changes the Medicare program (or other government program for Retirees) in such a fashion as to affect these caps, the parties will meet promptly for the purpose of adjusting the caps to conform to the changes in the Medicare (or other government) program.  In no event shall an employee who is eligible for a Deferred Vested Pension qualify for any benefits under the Lyon Group Insurance Plan.

The 2005 Insurance Agreement is effective and binding on Lyon and USW Local 1636 until February 15, 2009, and shall continue from year to year unless either party within 60 days prior to the anniversary date provides notice to the other of its desire to modify, change, or terminate the Insurance Agreement.

18. The Program is described in greater detail in the SPD.  The SPD (attached hereto as Exhibit C) is a plan document.  Section 3 of the SPD, as revised January 6, 2004, is titled "Future Cost Sharing," and describes the calculation of the cap amount, the determination of the

difference between the cap amount and actual plan expenses, and the retirees' obligation to pay

for the difference generated in the previous year as follows:

> Effective January 1, 1994, the dollar amounts of Lyon's contributions to retiree medical care costs were frozen. This means that in any given year, Lyon will not pay any more than an annually adjusted cap for that calendar year for all medical benefit claim costs for all retirees (including salaried retirees, retirees from other plant locations, and Aurora hourly retirees). In 1994, the cap was $750,000. This figure has been adjusted each year by (1) adding $4,000 for each new retiree who enters the Program and (2) deducting $1,500 for each retiree, spouse or dependent who leaves the Program.

> Effective January 1, 2002, $4,750 will be added for each new retiree entering the Program and $1,250 will be deducted for each retiree, spouse or dependent who leaves the Program.

> At the end of each calendar year, the adjusted cap is compared to actual retiree plan expenses. If medical costs exceed the adjusted cap, all current retirees with coverage will be required to make a contribution to the Program in order to maintain coverage. You will be billed for this contribution and allowed to pay it over the next plan year; you will be allowed to choose semiannual, quarterly or monthly payments. In any year in which claim costs do not exceed the cap, there will be no contribution required, nor will there be any refunds from Lyon.

19. Beginning with the adoption of the 1994 Insurance Agreement, Lyon was required to

and did calculate annually the cap on its annual plan contributions and the participant

contributions required under the terms of the successive Insurance Agreements and the

Program. In February or March of each calendar year, Lyon notified the union and the retirees

participating in the Program of the aggregate employer contribution cap for the current year, as

well as the participant contributions Lyon would impose on participants to maintain coverage

under the Program ("pro rated contributions"), an amount calculated based on the difference

between the cap for the previous year and the amount of medical and prescription claims made

under the Program during that year by retirees participating in the program, then divided by the

number of participants in the Program as of December 31 of that previous year. These letters

also showed the calculations that would determine the cap amount for the current calendar year.

Prior to May 2007, the named plaintiffs, except for plaintiff Mosby (who retired in 2007), all were required to pay—and did pay—pro rated contributions to maintain coverage under the Program.

20. Pursuant to the Insurance Agreements and the SPD, Lyon is required to, and prior to May 2007 did, base its calculation of the pro rated contribution amount exclusively on the difference between the actual retiree plan expenses or medical claim costs of the immediately-previous year and the applicable cap for that year.

21. Pursuant to the Insurance Agreements and the SPD, Lyon is required to, and prior to May 2007 did, calculate the difference between the actual costs of the program and the applicable cap, and set the pro rated contribution applicable to the Program year based on the number of participants in the Program as of the last day of the prior calendar year. Neither the collectively bargained Insurance Agreements nor the Lyon Plan and Program documents allow Lyon to increase that year's pro rated contribution once it has been set based on the cap, expenses, and number of participants in the prior Program year. Between 1994 and 2007, once the pro rated contribution was established Lyon never adjusted that contribution rate in any year, and did not attempt to increase or otherwise change the amount of the pro rated contributions that had been set for that year.

22. Pursuant to the Insurance Agreements and the SPD, Lyon was entitled to collect, and prior to 2007 only sought to collect, pro rated contributions from the current retirees who participated in the Program in the year for which Lyon's expenses were calculated to have exceeded the agreed-to cap on Lyon's funding of medical benefits.

23. Lyon's practices from 1995 to May 2007 were communicated to USW Local 1636 by Lyon, and the parties to the Insurance Agreements understood that Lyon's practices in calculating and assessing contributions were consistent with the Insurance Agreements.

24. On March 16, 2007, Lyon sent a letter to the union regarding the actual claim costs of the Program for 2006 and the relationship of those costs to the negotiated "cap." This letter stated that the cost of medical and prescription claims for 2006 had been $840,230.89, which was $271,480.89 more than the 2006 cap of $568,750.00. The letter then stated:

> According to our agreement, the amount that Retiree medical costs exceed the cap are to be shared by all Retirees on the Plan by paying a pro rated contribution. On December 31, 2006, we had 106 Retirees on the Plan, therefore, the monthly contribution will be $213.42. We plan to inform the Retirees in a letter being sent out on March 16, 2007, with the first payment due in April 2007. The $213.42 per month payments will continue through March 2008.

*See* Exhibit D ("March 16, 2007 Letter").

25. On March 16, 2007, Lyon also sent a similar letter to participants in the Lyon Plan, including all the named plaintiffs except plaintiff Mosby. This letter described the calculation that had been made regarding the difference between the costs incurred by the Lyon Retirees Health Plan in 2006 and the 2006 cap, and stated that the pro rated contribution for the coming Program year would be $2,561.04 for each participating retiree. The letter notified the participants that they would be required to make 12 monthly payments of $213.42 beginning on April 15, 2007, or that they could make the pro rated payments on a quarterly, semi-annual, or annual basis. *See* Exhibit E ("March 2007 Letter").

26. Retiree participants in the Program, including all the named plaintiffs other than plaintiff Mosby, made the pro rated contributions demanded in the March 2007 letter, and continued to be participants in the Lyon Plan and eligible for benefits through the Program.

27. On May 15, 2007, Lyon sent a letter to all Lyon retirees eligible to participate in the Program.  *See* Exhibit F ("May 2007 Letter").  After reviewing the manner in which the pro rated contributions had been calculated on an annual basis in past years, the May 2007 Letter asserted that a recently completed "audit of the collections of Retiree Payments and Actual Claims Paid back to the year 2001" showed that there had been a "shortfall" of $340,073.14 in the amount paid by the retirees to Lyon.  The May 2007 Letter indicated that, during the audit, Lyon discovered that this "shortfall" was due to (i) participants who were paying their pro-rated contribution on a monthly, quarterly, or semi-annual basis dying or opting out of the Program before making all their payments for a given year, (ii) Lyon's practice of not charging the pro-rated contribution to participants during their first year participating in the Program, and (iii) "certain amounts for additional insurance purchased by [Lyon] and/or rebate programs in which the Company participates, were being improperly deducted from the total claims paid amount at the time of the cap calculation."

28. The May 2007 Letter stated that the $340,073.14 "shortfall . . . will be shared by all current retirees participating in the plan" during the year between April 2007 and March 2008.  While the March 2007 Letter set the annual pro rated contribution based on the 2006 Program year at $2,561.04 (with monthly payments of $213.42), the May 2007 Letter purported to require each participant in the Program to contribute $5,937.32 for the 2006 Program year.  The May 2007 Letter stated that, assuming the April 15 and May 15, 2007 payments were made, every eligible retiree (including those new retirees who had not participated in the Program in the 2006 Program year), in order to maintain coverage, would be required to make a single contribution of $3,376.28 in addition to the monthly payments of $213.42 set in the March Letter.  Alternatively, Program participants and eligible retirees would be permitted to maintain

(or obtain) coverage by making a payment of $1,057.50 by June 15, 2007, and monthly payments of $494.78 thereafter.

29. The May 2007 Letter noted that Lyon had audited the "shortfall" only back to 2001, and that "[i]t is believed that the total shortfall could be even higher if the program was audited back to its inception in 1994"; Lyon specifically reserved its "right" to audit the program back to 1994 and impose additional "shortfalls" on the retirees. The May 2007 Letter concluded by encouraging the participating retirees to engage in a "cost/benefit analysis to determine if you want to continue to participate in our plan," and provided the address of a federal government website listing alternative programs.

30. The named plaintiffs and the other participating retirees live on fixed, and limited, incomes. Many Program participants, including named plaintiffs Pryor and Campbell, could not afford the increased pro rated contributions demanded by Lyon in the May 2007 Letter.

31. Approximately 103 retirees participated in the Program as of the May 2007 letter. Plaintiff Mosby and, on information and belief, other retirees became or will become eligible to participate in the Program during 2007. As a result of Defendants' demand for increased pro rated contributions in the May 2007 letter, within the next nine weeks approximately forty percent of the retirees were terminated from the Lyon Plan for non-payment of contributions, including plaintiffs Pryor and Campbell.

32. On July 20, 2007, Lyon notified participants in the Program by letter of yet additional contribution requirements. *See* Exhibit G ("July 2007 Letter"). The July 2007 Letter notified the plan participants that Lyon had again recalculated the pro rated contributions owed by each participating retiree, taking into account the decrease in plan enrollment and the attendant increase in each retiree's pro rated share which resulted from the termination of nearly

two-fifths of the participants from the plan. The July 2007 Letter notified the remaining

participants that in order to maintain coverage each would be required to pay $779.77 per month

beginning on August 15, 2007 and, in addition, would be required to make increased retroactive

payments for prior months. The July 2007 Letter stated that the increase in pro rated

contributions due to participants dropping out of the plan was "unavoidable and may continue to

occur should additional participants opt out of the Plan in the future," and again encouraged

participating retirees to explore other health insurance alternatives.

33. As a result of the increased pro rated contributions required by the July 2007 Letter,

approximately two-thirds of the remaining retirees participating in the Lyon Plan as of July 20,

2007 were terminated from the Lyon Plan for non-payment of contributions, including plaintiff

Fields.

34. On August 21, 2007, Lyon notified the participants of yet another increase in

required contributions. *See* Exhibit H ("August 2007 letter"). The August 2007 Letter notified

the plan participants that Lyon had recalculated the pro rated contributions owed by each

participating retiree, taking into account the decrease in plan enrollment and the attendant

increase in each retiree's pro rated share which resulted from the termination of nearly ninety

percent of the participants from the plan. The August 2007 Letter notified the remaining 17

participants that in order to maintain coverage each would be required to pay $3,692.93 per

month beginning by September 15, 2007.

35. The named plaintiffs who were participating in the Program as of the date of the

May 2007 Letter have all been terminated from participation for nonpayment and, on

information and belief, all of the approximately 106 retirees participating in the Program as of

May 2007 have now been terminated as a result of the ever-increasing pro rated contributions

demanded of them by Defendants.  Each of the retiree participants has been required to find

alternative options to fund their medical care and prescription drug needs and more of the costs

of the alternative options is paid by Lyon contributions.  The effect of May 2007 and August

2007 Letters and the termination of all participants from the Program has been to reduce Lyon's

funding obligations under the 2005 Insurance Agreement and the SPD.

## CLASS ALLEGATIONS

36. The proposed class that plaintiffs Fields, Campbell, and Pryor seek to represent

consists of Lyon retirees and eligible dependents who were participating in the Program as of

March 16, 2007, and from whom, beginning in May 2007, additional and increased pro rated

contributions were demanded by Lyon and the Lyon Plan to continue participation.  Plaintiff

Mosby is not a member or representative of the proposed class, but brings his claims in his

individual capacity.

37. The proposed class consists of approximately 103 retiree participants and an

unknown additional number of eligible dependants.  The members of the class are so numerous

that joinder of all members as plaintiffs would be impracticable, thus satisfying the

requirements of Fed. R. Civ. P. 23(a)(1).

38. Common questions of law and fact exist as to all members of the proposed class and

predominate over any question solely affecting individual members of the class, thus satisfying

the requirements of Fed. R. Civ. P. 23(a)(2).  These common questions include whether

Defendants are permitted under the terms of the 2005 Insurance Agreement and the component

Program of the Lyon Plan to asses additional pro rated employee contributions retroactively,

whether Defendants are permitted under the terms of the 2005 Insurance Agreement and the

component Program of the Lyon Plan to recalculate the pro rated employee contributions more

than once a year, whether, under ERISA and the LMRA, Defendants wrongfully terminated Lyon Plan coverage for those employees who failed to pay the increased pro rated contributions demanded by Defendants, and whether Defendants engaged in breaches of their fiduciary duty to plaintiffs and the Plan by recalculating the pro rated contributions retroactively and seeking increased contributions for class members to remain eligible to participate in the Lyon Plan and to receive benefits through the Program.

39. The factual and legal claims of the named plaintiffs are typical of the claims of all members of the proposed class, thus satisfying the requirements of Fed. R. Civ. P. 23(a)(3).

40. The named plaintiffs will fairly and adequately protect the interests of the proposed class, as required by Fed. R. Civ. P. 23(a)(4), and have retained experienced attorneys who are knowledgeable and skilled in litigation of this kind.

41. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) in that the Defendants' actions affect all persons within the proposed class with respect to their claims that Defendants breached the Insurance Agreement and violated their rights under the Lyon Plan and under ERISA, making appropriate final declaratory and injunctive relief with respect to the class. Class certification would also be appropriate under Fed. R. Civ. P. 23(b)(1)(A), in that prosecution of separate actions by members of the proposed class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, and under Fed. R. Civ. P. 23(b)(3), in that the common issues predominate over the individual issues and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable, and because the expense and burden of the individual litigation substantially exceeds the potential loss or recovery of any individual

plaintiff, it would be impractical for members of the proposed class to pursue individual

litigation to vindicate their rights.

**CLAIMS FOR RELIEF**

**COUNT I**
**(Against Defendant Lyon by Plaintiffs Fields, Campbell, Pryor, and the Proposed Class)**

42. Paragraphs 1-41 are incorporated by reference as though fully set forth herein.

43. The 2005 Insurance Agreement negotiated by Defendant Lyon with USW Local

1636 is a  contract between an employer and a labor organization representing employees in an

industry affecting commerce, within the meaning of Section 301 of the LMRA.

44. Plaintiffs, as former employees of Defendant Lyon previously represented by USW

Local 1636, are intended beneficiaries of the 2005 Insurance Agreement, are entitled to benefits

under the terms of the 2005 Insurance Agreement, and have standing to assert their rights under

the 2005 Insurance Agreement.

45. The 2005 Insurance Agreement does not permit Lyon to base pro rated contribution

amounts for the 2007 Program year on expenses incurred in years other than 2006, does not

permit Lyon to recalculate the pro rated contributions more than once for the 2007 Program

year, and does not permit Lyon to seek to charge any pro rated contributions in the 2007

Program year to retirees who did not participate in the Program in 2006.

46. Defendant Lyon violated the 2005 Insurance Agreement in May of 2007, July of

2007, and August of 2007, by requiring plaintiffs Fields, Campbell, Pryor, and members of the

proposed class to make payments above those set out in the March 2007 Letter, and by

terminating the participating retirees' participation in the Lyon Plan and their eligibility for

Program benefits when they failed to make the additional, improperly demanded, contributions.

47. But for Defendant Lyon's violation of the 2005 Insurance Agreement, plaintiffs Fields, Campbell, Pryor, and members of the proposed class would have continued participating in the Lyon Plan.

48. Defendant Lyon's violations are continuing as of the date of this Complaint and have caused damage to plaintiffs Fields, Campbell, Pryor and members of the proposed class.

49. Members of the proposed class risk suffering irreparable injury if the contract violations are not remedied and they are not permitted to resume coverage under the Program at the $213.48 monthly rate set in the March 2007 Letter.

**COUNT II**
**(Against Lyon Retiree Health Plan by Plaintiffs Fields, Campbell, Pryor, and members of the Proposed Class)**

50. Paragraphs 1-49 are incorporated by reference as though fully set forth herein.

51. Plaintiffs Fields, Campbell, Pryor, and the proposed class members are beneficiaries and/or participants of the Lyon Plan, which is an ERISA-covered health benefits plan.

52. Plaintiffs Fields, Campbell, Pryor, and the proposed class members have the right to participate in the component Program of the Lyon Plan according to the terms set forth in the 2005 Insurance Agreement, the plan document, and the Program SPD.  As of May 2007, Plaintiffs Fields, Campbell, Pryor, and members of the proposed class, were participants in the Lyon Plan and, were eligible to continue benefit coverage under the Program.

53. Defendant Lyon violated the Plaintiffs' rights under the Lyon Plan by denying plaintiffs and members of the proposed class the opportunity to continue participating in the Lyon Plan and to maintain coverage under the Program by tendering the contributions set out in the March 2007 Letter, and by requiring plaintiffs to tender higher contribution rates in violation of the terms of the Program.

54. By the actions of Defendant Lyon, the Lyon Plan has deprived or will deprive plaintiffs of benefits due to them under the terms of the Program, as the plaintiffs and class members have been forced out of the Plan due to their inability to pay the exorbitant and improper premiums now demanded by the Defendants, and now must pay the full cost of any coverage they are able to procure without any funding of the medical benefits by Lyon.

55. Defendant Lyon's demand for and collection of improper contributions from plaintiffs, and its termination of coverage for plaintiffs and proposed class members who did not pay the improper premiums is actionable under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits owed to plaintiffs and the members of the proposed class, to enforce their rights under the terms of the Program and Lyon Plan, and to clarify their rights to future benefits under the Lyon Plan and the Program.

## COUNT III
### (Against Defendant Lyon on behalf of Plaintiff Mosby)

56.    Paragraphs 1-55 are incorporated by reference as though fully set forth herein.

57. Plaintiff Mosby, as a former employee of Defendant Lyon previously represented by USW Local 1636, is an intended beneficiary of the 2005 Insurance Agreement, is entitled to benefits under the terms of the 2005 Insurance Agreement, and has standing to assert his rights to benefits under the 2005 Insurance Agreement.

58. The 2005 Insurance Agreement does not authorize Lyon to seek to charge any pro rated contributions in the 2007 Program year to retirees who did not participate in the Program in 2006.

59. Defendant Lyon violated the 2005 Insurance Agreement in May of 2007 by requiring plaintiff Mosby to make payments as a condition of participating in the Program, even though Mosby did not participate in the Program in 2006 and, under the 2005 Insurance

Agreement, could not be required to reimburse Defendant Lyon for expenses incurred by other participants in the 2006 Program year.  Defendant Lyon also violated the 2005 Insurance Agreement by refusing to permit Mosby to participate in the Program on the terms set out in the 2005 Insurance Agreement.

60. Because of Defendant Lyon's breach of the 2005 Insurance Agreement, plaintiff Mosby was unable to participate in the Lyon Plan and to obtain medical and prescription drug benefits under the terms of the Program.

61. Defendant Lyon's violation of the 2005 Insurance Agreement has caused plaintiff Mosby damages and continues as of the date of this Complaint.

**COUNT IV**
**(Against Lyon Retiree Health Plan by Plaintiff Mosby)**

62. Paragraphs 1-61 are incorporated by reference as though fully set forth herein.

63. Plaintiff Mosby, as an eligible retiree of Defendant Lyon, has had, since May 2007, the right to participate in the component Program of the Lyon Plan according to the terms set forth in the 2005 Insurance Agreement, the plan document and the Program SPD.

64. Defendant Lyon violated plaintiff Mosby's rights under the Lyon Plan by denying him the opportunity to begin to participate in the component Program of the Lyon Plan without cost, and by requiring him to make contributions set out in the May 2007 Letter, the July 2007 Letter and the August 2007 Letter in order to participate in the Program.

65. By the actions of Defendant Lyon, the Lyon Plan has deprived plaintiff Mosby of benefits due to him under the terms of the Program.  Plaintiff Mosby has been required to pay the full cost of substitute insurance that offers different benefits from the benefits provided through the Program.

19

66. Defendant Lyon's violation of plaintiff Mosby's rights under the terms of the Program and the Lyon Plan is actionable under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to enforce his rights under the terms of the Program and Lyon Plan, and to clarify his rights to future benefits under the Lyon Plan and the program.

**COUNT V**
**(Against Lyon and L & D Group by all Plaintiffs. Pled in the Alternative to Counts I-IV)**

67. Paragraphs 1-66 are incorporated by reference as though fully set forth herein.

68. Defendant Lyon is a fiduciary with respect to the Lyon Plan and the component Program within the meaning of ERISA § 2(21)(A), because it is the named Plan Administrator of the Lyon Plan, and because it exercises discretionary authority or discretionary control in the management and/or administration of the Plan or of Plan assets.

69. Defendant L & D is a fiduciary with respect to the Lyon Plan and the component Program within the meaning of ERISA § 2(21)(A) because, on information and belief, it exercises discretionary authority or discretionary control in the management and/or administration of the Plan or plan assets, or because it exercises *de facto* control over the Plan Administrator in its plan administration.

70. As ERISA fiduciaries, Defendants Lyon and L & D are required to discharge their duties with respect to the plan solely in the interest of the participants and beneficiaries, including plaintiffs and the proposed class members, with the skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in conducting the affairs of the Lyon Plan and the component Program, and in accordance with the plan documents insofar as consistent with their duties of prudence and loyalty.

71. Defendants Lyon and L & D have breached their ERISA fiduciary duty in administering the Lyon Plan and the component Program, *inter alia*, by (a) imprudently and negligently failing to calculate properly the required amount of participant contributions for the years 2001-2006, and failing to timely and properly notify the appropriate participants in each those Program years of the correct amount of participant contributions required under the Program; (b) failing to collect appropriate participant contributions for the years 2001-2006 from the participants who allegedly owed contributions in each such Program year; (c) predicating continued participation in the Lyon Plan and eligibility for benefits under the component Program on payment by the named plaintiffs and the proposed class members to Lyon of alleged contribution shortfalls that Lyon and/or L & D failed, through their own imprudence, to calculate and collect for the benefit of the plan in the years 2001-2006, and which caused participants to be terminated improperly by Lyon from the Lyon Plan and caused Lyon improperly to raise costs for the remaining participants in the Program; and (d) encouraging participants to cease participation in the Program for the purpose of reducing Lyon's obligation to fund the Program.

72. Named plaintiffs and members of the proposed class have been harmed by Defendants Lyon and L & D's breaches of fiduciary duty, and the breaches of duty have caused plaintiffs to have their rights to retiree medical insurance for themselves and for their dependents under the Program improperly terminated.

73. To the extent that plaintiffs' claims for benefits against the Lyon Plan do not permit plaintiffs and proposed class members to enforce their rights, Defendants Lyon and L & D are liable for harm caused to plaintiffs under ERISA §§ 409 and 502(a)(3).

74. These violations by Defendants Lyon and L & D are continuing as of the date of this Complaint.

75. Members of the proposed class risk suffering irreparable injury if Defendant Lyon and L & D's fiduciary breaches are not redressed.

## Prayer for Relief

WHEREFORE, plaintiffs demand judgment against Defendants on behalf of themselves and members of the Class, and pray for the following relief:

a. That the Court certify the action as an appropriate class action, and appoint plaintiffs Fields, Campbell, and Pryor as class representatives, and plaintiffs' attorneys as counsel for the class;

b. That the Court declare that Defendant Lyon violated the 2005 Insurance Agreement and the Lyon Plan by calculating and demanding excessive participant contributions from the class and from Plaintiff Mosby, and by terminating named plaintiffs and class members from the Lyon Plan and the component Program when they failed to make the improperly demanded contributions;

c. That the Court declare that eligible retirees of Lyon who were participating in the Lyon Plan and the component Program are entitled to continue participation in the Program through March 2008 at the rate calculated in the March 2007 Letter or, if the eligible retiree did not participate in the Program in 2006, at no cost until April 2008;

d. That the Court order that Defendants Lyon and Lyon Plan reinstate to the Lyon Plan and component Program all participants who were terminated due

to nonpayment of premiums demanded in the May 2007 Letter, the July 2007 Letter, or the August 2007 Letter, and enjoin Defendants from seeking to collect participant contributions in amounts greater than $213.48 per month for the remaining periods of the 2007 Program year or, if the eligible retiree did not participate in the Program in 2006, at no cost until April 2008;

e.  That the Court order Lyon and the Lyon Plan to enroll plaintiff Mosby in the Lyon Plan and the component Program and permit plaintiff Mosby to participate in the Program at no cost through March 2008;

f.  That the Court enjoin Defendants Lyon and the Lyon Plan from calculating participant contributions in a manner that violates Defendants' obligations under the Insurance Agreement and Plan for the period in which the Insurance Agreement is in place;

g.  That the Court award named plaintiffs and class members actual, consequential, and nominal damages for Defendant Lyon's breaches of the 2005 Insurance Agreement;

h.  That the Court award plaintiffs' costs, attorneys' fees and expenses incurred in connection with this action; and

i.  That the Court award such other legal or equitable relief as the Court deems appropriate, including judgment for any amounts and/or interest thereon that may accrue subsequent to the filing of this Complaint.

Plaintiffs demand a jury trial for all claims triable by a jury.

Respectfully submitted,


   /s/ Robert Alexander
Robert Alexander
Todd Edelman
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C.  20005-2207
(202) 842-2600


   /s/ Stephen A. Yokich
Stephen A. Yokich
Cornfield & Feldman
25 East Washington Street
Suite 1400
Chicago, IL 60602


*Attorneys for Plaintiffs*

Dated: December 6, 2007

# EXHIBIT A

## 1994 Insurance Agreement

# I N S U R A N C E   A G R E E M E N T

THIS INSURANCE AGREEMENT, dated March 6, 1994, is entered into by and between LYON METAL PRODUCTS, INCORPORATED, Aurora, Illinois (hereinafter referred to as the Company) and the United Steelworkers of America, A.F.L.-C.I.O., on behalf of itself and LOCAL UNION NO. 1636 of the UNITED STEELWORKERS OF AMERICA, A.F.L.-C.I.O. (hereinafter referred to as the Union). This Agreement shall be binding upon the parties and their respective successors.

This Insurance Agreement shall be applicable to the bargaining unit of production and maintenance Employees of the Company at its Aurora, Illinois plant as covered by the Basic Agreement between the Company and the Union.

The term "Basic Agreement" means the labor agreement between the Company and the Union dated March 6, 1994, or any such succeeding agreement between the Company and the Union which is, during the life of this Insurance Agreement, applicable to such production and maintenance employees.

The provisions in this Insurance Agreement shall become effective on the respective dates specified herein.


## ARTICLE I -- SOCIAL INSURANCE

Section 1.   It is agreed that a plan of group insurance shall be provided for eligible regular full-time Employees, with benefits as revised effective March 6, 1994, covering life insurance (contributory and non-contributory), insurance for death or dismemberment by accidental means (non-occupational), and weekly sickness and accident insurance for Employees. Also provided for eligible regular full-time Employees and their eligible dependents effective May 1, 1994 is Major Medical coverage with an associated Prescription Drug Plan; or, as an alternative to such coverage, employees may elect to have medical and prescription drug coverage provided by the a Health Maintenance Organization (HMO). Details of all such coverages is to be provided to all Employees in revised booklets entitled "Group Benefit Plans - Life Insurance Lyon Metal Products, Inc." and "Lyon Metal Products, Inc. - Aurora Hourly Employees Health Plan", or in materials provided by the HMO.

The Group Insurance program shall also include a dental insurance plan for eligible regular full-time employees, as last modified March 1, 1982 and is outlined in the booklet entitled "Lyon Metal Products, Inc. - Dental Care Plan for Hourly Employees."

1

Article I - Section 1 - continued                    <u>SOCIAL INSURANCE</u>

Employees are also covered by a Long Term Disability (LTD) Plan, on a voluntary/contributory basis, as described in the booklet entitled "Group Benefits - Lyon Metal Products, Inc.," as revised effective January 1, 1995.

With the exception of the optional plans for contributory life insurance and long term disability (LTD as effective January 1, 1995) and the Health Maintenance Organization (HMO) coverage, the cost of such insurance programs shall be paid by the Company. The cost of contributory life insurance and long term disability (as of January 1, 1995) shall be borne entirely by the Employee, while the cost of HMO coverage will be shared, but only with employees hired prior to February 15, 1988, with these Employees paying fifteen dollars ($15.00) per month for Single coverage and fifty dollars ($50.00) per month for Family coverage. The Company will make available its pre-tax Flexible Benefit Plan to assist these employees with this contribution.

Section 2.  If during the term of this Agreement or any extension or renewal thereof, there shall become effective any compulsory state or federal program of social insurance for life, and/or death or dismemberment by accidental means (non-occupational), and/or weekly sickness and accident benefits, and/or hospital care, and/or surgical care, and/or physicians' attendance benefit, and/or diagnostic X-ray and laboratory examinations, and/or radiation therapy, and/or medical care, and/or dental care, which is financed in whole or in part by compulsory contributions from either the Company, employees, or both, and which program duplicates in whole or in part the program of benefits available under this Agreement, then the benefits available under this Agreement shall be automatically modified in direct proportion and the cost to the Company shall be reduced accordingly, so that the modified benefits then available under this Agreement shall, when added to the benefits under such a compulsory program, equal the benefits now in effect.

Section 3.  In the event any future governmental order, regulation or law requires a change in the provisions of this Insurance Agreement, the Company shall be free to make such changes as are necessary to comply, but shall promptly notify the Union of such changes and the reasons therefor.

Section 4.  Benefits of the group insurance program provided pursuant to the agreement of February 17, 1991 and any and all pertinent prior insurance agreements, shall be applicable for any occurrence prior to March 6, 1994 for which benefits were provided by such prior program(s), and subject to all of the provisions applicable thereto.

2

Article I - Section 4 Continued          <u>SOCIAL INSURANCE</u>

Any group insurance which, as of March 6, 1994, is being continued during an employee's approved leave of absence, disability or layoff, shall be continued only in accordance with the provisions of such prior program.    Such employees shall not be eligible to participate under the revised program of group insurance until they return to active work on or after March 6, 1994.

Section 5.  Beginning on the first day of the "insurance month" coincident with or immediately following an employee's retirement, the amount of group term life insurance then in effect shall be reduced fifty percent (50%) of the amount for which a participant employee was insured on the day immediately preceding his retirement. Beginning on the first day of the "insurance month" coincident with or immediately following attainment of age seventy (70), the amount of group life insurance then in effect shall be reduced fifty percent (50%) of the amount for which a participant employee or retiree (as the case may be) was insured on the day immediately preceding his seventieth (70th) birthday.

In no case shall the amount of "Continued Life Insurance" be less than $4,500.00.

Section 6.  "Continued Life Insurance" may be provided by the establishment of some other arrangements which properly guarantee payment of death claims, as may from time to time be deemed desirable by the Company for such purposes.

Section 7.  The applicable amount of life insurance or "Continued Life Insurance" for participating employees who retire on or after May 1, 1955, under the Company's Retirement Plan, shall be provided after retirement without any contribution toward the premium by such pensioner.

All other existing coverages under the Group Insurance Plan shall cease on retirement.    However, in lieu thereof, major medical expense insurance as outlined in the booklet entitled "Lyon Metal Products, Inc. - Aurora Hourly Employees Health Plan" shall be provided for participating employees (i.e., those hired prior to February 15, 1988) who retire on or after March 1, 1965 (except as modified by the following paragraph) under the Company's retirement plan.  Such major medical expense insurance for each such pensioner and his eligible dependents, shall be provided during his retirement without any contribution toward the premium by such pensioner, except as provided in the following two paragraphs.

3

Article I Section 7 - continued                    <u>SOCIAL INSURANCE</u>

Active employees who reach the age of 60 before March 1, 1988 and subsequently retire and receive a pension from the Lyon Pension Plan will be eligible for medical expense insurance as described in the foregoing paragraph. Active employees who have not reached age 60 by March 1, 1988 may be eligible for medical expense insurance (with benefits processed by the Medicare "carve out" method) upon retirement on pension under the Lyon Pension Plan as follows: (1) employees with 0-10 year's service - no coverage; (2) employees with 10-20 year's service - coverage subject to a $300 deductible, a $1,000 out-of-pocket limit, and payment of 50% of the monthly premium; (3) employees with 20-30 year's service - coverage subject to a $200 deductible, a $750 out-of-pocket limit, and payment of 25% of the monthly premium; and (4) employees with over 30 year's service - coverage subject to a $100 deductible, $500 out-of-pocket limit, and no payment toward the monthly premium.

In addition, the Company's Medical contribution for all currently eligible future Retirees (i.e., those hired prior to February 15, 1988) and their dependents and for all current Retirees and dependents who are covered by the program will be frozen as follows: The total amount of benefits (for <u>all</u> Lyon Retirees) paid per calendar year beginning with 1994 is capped at $750,000. However, the cap will be adjusted during each year by (1) adding $4,000 for each new retiree who enters the program, and (2) deducting $1,500 for each retiree life (retirees, spouse, or dependent) that leaves the program. The adjusted cap will be compared with actual plan expenses at the end of the calendar year. If claims exceed the adjusted cap, current Retirees will be expected to pay a pro rated monthly contribution. In any year if actual Plan costs are less than the cap, there will be no contribution from Retirees and the Company shall not be required to pay more than the actual Plan costs or make any refunds. In the event that the Federal government changes the Medicare program (or other government program for Retirees) in such a fashion as to affect these caps, the parties will meet promptly for the purpose of adjusting the caps to conform to the changes in the Medicare (or other government) program.

In no event shall an employee who is eligible for a Deferred Vested Pension qualify for any benefits under the Lyon Group Insurance Plan.

Section 8.   If a participating employee remains in employment with the Company following attainment of age seventy (70), the amount of insurance for death or dismemberment by accidental means shall be reduced in accordance with the formula for life insurance, as specified in Section 5 of this Article.

4

Article I - Section 8 Continued                    <u>SOCIAL INSURANCE</u>

In any event, all group insurance for death and dismemberment by accidental means shall be cancelled upon retirement or termination of employment for any reason.

Section 9.   There shall be no increase in the amount of insurance for death or dismemberment by accidental means on or after a participating employee's seventieth (70th) birthday.

Section 10.  Differences between claimants and the processors of claims or the insurance company shall not be subject to the grievance procedure under the Basic Agreement or any other agreement between the parties.

Section 11.  The failure of the insurance company to provide for any benefit shall result in no liability to the Company; nor shall such failure be considered a breach by the Company of any of the obligations which it has undertaken by this or any other Agreement with the Union.

Section 12.  The Company will provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the Group Insurance Plan has been denied, setting forth the specific reasons for denial and written in a manner calculated to be understood by the participant.

In addition, the Company's Employee Benefits Committee shall afford reasonable opportunity to any participant or beneficiary whose claim for benefits has been denied, for a full and fair review of this decision by such Committee.

Section 13.  The Company retains the exclusive right to select and/or to make changes in the insurance underwriter(s) and/or to establish some other arrangements which will provide the same program of benefits which are provided by this Agreement, as may from time to time be deemed desirable by the Company.

5

## ARTICLE II -- GENERAL PROVISIONS

Section 1.  Nothing contained in this Insurance Agreement shall be construed as a contract of employment between the Company and any employee, or as a right of any employee to be continued in the employment of the Company, or as a limitation of the Company's right to discharge, suspend or discipline any employee.

Section 2.  The parties hereto acknowledge that during the negotiations which resulted in this Insurance Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement; provided, however, that negotiations or bargaining with respect to such matters may be voluntarily permitted by the mutual consent of the parties hereto.

Section 3.  The Company and the Union acknowledge that the federal Health Maintenance Organization Act of 1973 which became effective November 27, 1975, applies to the employees covered by this Insurance Agreement.

Under this law, a qualified Health Maintenance Organization(s) (commonly referred to a "HMO") may, under certain conditions, apply to the Company in writing asking to be accepted by the Company as an optional medical health benefits plan which may be selected by individual employees in lieu of the medical health benefits plan covered by this Insurance Agreement.

The Company shall not be required to seek out or develop an HMO option for its employees covered by this Insurance Agreement.

In the event that an HMO option is offered to its Employees, it is also agreed that the Company is not obligated to pay more for HMO services than the amount of the medical health benefits plan covered by this Insurance Agreement.  If the HMO plan offers fewer benefits than those provided by the medical health benefits plan covered by this Insurance Agreement, the Company's contribution to the HMO shall be reduced proportionately.

Neither the Company nor the Union cedes any right which each may have under the Health Maintenance Organization Act of 1973 and/or to which it (they) may be entitled by any future federal legislation and/or regulations on this subject.

6

## ARTICLE III -- PERIOD OF AGREEMENT

Section 1.  This Insurance Agreement shall become effective on March 6, 1994, and shall continue in effect until 11:59 p.m. on February 15, 1997, and shall continue in effect from year to year thereafter, unless either party notifies the other party in writing sixty (60) calendar days prior to the anniversary date of its desire to modify, change, or terminate this Agreement.

Upon receipt of such written notice concerning a modification, change, or termination of this Agreement expiring on February 15, 1997, or on any anniversary date thereafter, the two parties shall meet within thirty (30) calendar days, unless otherwise mutually agreed, for the purpose of negotiating such issue. If negotiations are not completed within the sixty (60) calendar day period, this Agreement may be extended from time to time for the purpose of continuing negotiations and reaching final agreement.

Section 2.  In the event that the Basic Agreement between the Company and the Union is terminated, or in the event that either party or the employees resort to any strike or any lockout, as the case may be, during the term of this Insurance Agreement, this Agreement shall terminate at the beginning of such action; provided, however, that if and when the Company and the Union shall have reached an Agreement with respect to such action, this Insurance Agreement shall be reinstated and shall continue in effect as provided in Section 1 of this Article.

Section 3.  The Union agrees for itself and its individual members that during the term of this Agreement, neither the Union nor any of its officers, stewards, agents, representatives nor any member shall:

a.  Make any request that the Company increase hourly rates of pay of the employees on account of or for use in paying in the cost, in whole or in part, of any program of insurance benefits of the employees or of their dependents; or

b.  Make any request that the Company change the program of benefits available under this Agreement or increase its contributions toward the cost of any program of insurance benefits for employees or their dependents; or

c.  Instigate, authorize, call, support, maintain, engage in or continue to engage in, or in any manner encourage or sanction any strike, walk-out, work stoppage, interruption or slow down or impeding of work, boycott, or picketing of the Company's plant or premises for the purpose of securing any such increase or any such change or any other action with respect to insurance.

7

Article III - Section 3 Continued          <u>PERIOD OF AGREEMENT</u>

The Company agrees that during the term of this Agreement, it shall not engage in or sanction any lockout for the purpose of changing this Agreement.

Section 4.  The Company may terminate the employment or otherwise discipline any employee who foments, instigates, calls, supports, or participates in any act forbidden in Section 3c of this Article.

Section 5.  The Union agrees that it shall use its best efforts to prevent any act(s) forbidden in Section 3c of this Article on the part of any employee or group of employees, and that in the event that such acts take place by any employee or group of employees, the Union further agrees that it shall use its best efforts to cause an immediate cessation thereof.

Section 6.  It is understood and agreed that in the event any act forbidden in Section 3c of this Article was not instigated, authorized, called, supported or maintained by the International Union, the Local Union, or any of their officers, there shall be no liability on the part of the International Union, the Local Union, or any of their officers or agents, or members, except those officers or agents or members who participated in any of the acts forbidden by Section 3c of this Article, and as to such officers or agents or members the Company shall be limited in its recourse and remedy to such actions (including disciplinary measures) as it may have against them individually.

Nothing in this Section 6 shall restrict any right which the Company is or may be entitled to seek legal or other redress of any individual(s) who has caused damage to or injury to or loss of Company property, nor does the Company cede any rights in this regard to which it may be entitled by future legislation.

Section 7.  Any notices to be given under Article III of this Agreement shall be given by certified mail and shall be deemed to have been given at the time of mailing same. If such notice is to the Union, it shall be addressed to the United Steelworkers of America, 7218 W. 91st Street, Bridgeview, IL 60455. If such notice is to the Company, it shall be addressed to Lyon Metal Products, Incorporated, P. O. Box 671, Aurora, Illinois 60507. Either party may, by like written notice, change the address to which certified mail notice to it shall be given.

8

Signature page for Insurance Agreement dated March 6, 1994.

FOR LYON METAL PRODUCTS, INCORPORATED

R. Peter Washington
Chief Executive Officer

W. Gerard Gosselin
President

Keith E. Sladek
Executive Vice President

Donald E. Anderson
Vice President - Human Resources

Thomas G. Pold
Director of Operations

Dennis C. Hess
Area Superintendent

FOR UNITED STEELWORKERS OF AMERICA, AFL-CIO

George F. Becker
International President

Leonard Gerard
International Secretary-Treasurer

Richard Davis
International Vice President (Administration)

Leon Lynch
International Vice President (Human Affairs)

Jack Parton
Director, District 31

R. L. Pace
Sub-District Director

Craig Langele
Staff Representative

Larry Beck
Chairman of Committee, Local 1636

John Flynn, President, Local 1636

J. R. Pryor, Committeeman

Manuel Aponte, Committeeman

Jack Thompson, Committeeman

R. C. Pryor, Committeeman

Alvin Fields, Committeeman

SEP 1 3 1995

9

# EXHIBIT B

## 2005 Insurance Agreement

# INSURANCE AGREEMENT

THIS INSURANCE AGREEMENT, dated February 20, 2005, is entered into by and between LYON WORKSPACE PRODUCTS, L.L.C., Aurora, Illinois (hereinafter referred to as the Company) and the United Steelworkers of America, A.F.L.-C.I.O., on behalf of itself and LOCAL UNION NO. 1636 of the UNITED STEELWORKERS OF AMERICA, A.F.L.-C.I.O. (hereinafter referred to as the Union). This Agreement shall be binding upon the parties and their respective successors.

This Insurance Agreement shall be applicable to the bargaining unit of production and maintenance Employees of the Company at its Aurora, Illinois plant as covered by the Basic Agreement between the Company and the Union.

The term "Basic Agreement" means the labor agreement between the Company and the Union dated February 20, 2005, or any such succeeding agreement between the Company and the Union which is, during the life of this Insurance Agreement, applicable to such production and maintenance employees.

The provisions in this Insurance Agreement shall become effective on the respective dates specified herein.

## ARTICLE I -- SOCIAL INSURANCE

Section 1.   It is agreed that a plan of group insurance shall be provided for eligible regular full-time Employees, with benefits as revised effective February 20, 2005, covering life insurance (contributory and non-contributory), insurance for death or dismemberment by accidental means (non-occupational), and weekly sickness and accident insurance for Employees. Also provided for eligible regular full-time Employees and their eligible dependents effective June 1, 1997 is Medical coverage through a Preferred Provider Organization (PPO) with an associated Prescription Drug Plan; or, as an alternative to such coverage, employees may elect to have medical and prescription drug coverage provided by a Health Maintenance Organization (HMO). Details of all such coverages are to be provided to all Employees in materials provided by the PPO and HMO.

The Group Insurance program shall also include a dental insurance plan for eligible regular full-time employees, administered by the PPO.

Employees are also covered by a Long Term Disability (LTD) Plan, on a voluntary/contributory basis, as described in the booklet entitled "Group Benefits - Lyon Workspace Products, LLC, Voluntary Long Term Disability" as revised effective January 1, 1995.

1

Article I - Section 1 - continued                    SOCIAL INSURANCE

With the exception of the optional plans for contributory life insurance and long-term disability (LTD as effective January 1, 1995) and the Health Maintenance Organization (HMO) coverage until May 31, 1997, the cost of such insurance programs shall be paid by the Company. The cost of contributory life insurance and long term disability (as of January 1, 1995) shall be borne entirely by the Employee, while the cost of HMO coverage will be shared until May 31, 1997, but only with employees hired prior to February 15, 1988, with these Employees paying fifteen dollars ($15.00) per month for Single coverage and fifty dollars ($50.00) per month for Family coverage. After May 31, 1997 there will be no employee contribution required for HMO coverage. The Company will make available its pre-tax Flexible Benefit Plan to assist employees with any contribution. However, effective February 17, 2001, the HMO will have a $10.00 co-pay for office visits for employee and dependents.

Section 2.   If during the term of this Agreement or any extension or renewal thereof, there shall become effective any compulsory state or federal program of social insurance for life, and/or death or dismemberment by accidental means (non-occupational), and/or weekly sickness and accident benefits, and/or hospital care, and/or surgical care, and/or physicians' attendance benefit, and/or diagnostic X-ray and laboratory examinations, and/or radiation therapy, and/or medical care, and/or dental care, which is financed in whole or in part by compulsory contributions from either the Company, employees, or both, and which program duplicates in whole or in part the program of benefits available under this Agreement, then the benefits available under this Agreement shall be automatically modified in direct proportion and the cost to the Company shall be reduced accordingly, so that the modified benefits then available under this Agreement shall, when added to the benefits under such a compulsory program, equal the benefits now in effect.

Section 3.   In the event any future governmental order, regulation or law requires a change in the provisions of this Insurance Agreement, the Company shall be free to make such changes as are necessary to comply, but shall promptly notify the Union of such changes and the reasons therefore.

Article I - Section 4                    <u>SOCIAL INSURANCE</u>

Section 4.    Benefits of the group insurance program provided pursuant to the agreement of March 6, 1994 and any and all pertinent prior insurance agreements shall be applicable for any occurrence prior to February 20, 2005 for which benefits were provided by such prior program(s), and subject to all of the provisions applicable thereto.

Any group insurance, which as of February 20, 2005 is being continued during an employee's approved leave of absence, disability or layoff, shall be continued only in accordance with the provisions of such prior program. Such employees shall not be eligible to participate under the revised program of group insurance until they return to active work on or after February 20, 2005.

Section 5.    Beginning on the first day of the "insurance month" coincident with or immediately following an employee's retirement, the amount of group term life insurance then in effect shall be reduced fifty percent (50%) of the amount for which a participant employee was insured on the day immediately preceding his retirement. Beginning on the first day of the "insurance month" coincident with or immediately following attainment of age seventy (70), the amount of group life insurance then in effect shall be reduced fifty percent (50%) of the amount for which a participant employee or retiree (as the case may be) was insured on the day immediately preceding his seventieth (70th) birthday.

In no case shall the amount of "Continued Life Insurance" be less than $4,500.00.

Section 6.    "Continued Life Insurance" may be provided by the establishment of some other arrangements which properly guarantee payment of death claims, as may from time to time be deemed desirable by the Company for such purposes.

Section 7.    The applicable amount of life insurance or "Continued Life Insurance" for participating employees who retire on or after May 1, 1955, under the Company's Retirement Plan, shall be provided after retirement without any contribution toward the premium by such pensioner.

All other existing coverages under the Group Insurance Plan shall cease on retirement. However, in lieu thereof, major medical expense insurance as outlined in the booklet entitled "Lyon

3

Article I Section 7 - continued                    <u>SOCIAL INSURANCE</u>

Workspace Products, LLC Hourly Retirees Participating Provider Option Group No. P79850, Section 0200, 0300, 0400" shall be provided for participating employees (i.e., those hired prior to February 15, 1988) who retire on or after March 1, 1965 (except as modified by the following paragraph) under the Company's retirement plan.  Such major medical expense insurance for each such pensioner and his eligible dependents, shall be provided during his retirement without any contribution toward the premium by such pensioner, except as provided in the following two paragraphs.

Active employees who reach the age of 60 before March 1, 1988 and subsequently retire and receive a pension from the Lyon Pension Plan will be eligible for medical expense insurance as described in the foregoing paragraph.  Active employees who have not reached age 60 by March 1, 1988 may be eligible for medical expense insurance (with benefits processed by the Medicare "carve out" method) upon retirement on pension under the Lyon Pension Plan as follows: (1) employees with 0-10 year's service - no coverage; (2) employees with 10-20 year's service - coverage subject to a $300 deductible, a $1,000 out-of-pocket limit, and payment of 50% of the monthly premium; (3) employees with 20-30 year's service - coverage subject to a $200 deductible, a $750 out-of-pocket limit, and payment of 25% of the monthly premium; and (4) employees with over 30 year's service - coverage subject to a $100 deductible, $400 (effective 02/17/01) out-of-pocket limit, and no payment toward the monthly premium.

In addition, the Company's Medical contribution for all currently eligible future Retirees (i.e., those hired prior to February 15, 1988) and their dependents and for all current Retirees and dependents who are covered by the program will be frozen as follows:  The total amount of benefits (for all Lyon Retirees) paid per calendar year beginning with 1994 is capped at $750,000. However, the cap will be adjusted during each year by (1) adding $4,750 (effective 02/17/01) for each new retiree who enters the program, and (2) deducting $1,250 (effective 02/17/01) for each retiree life (retirees, spouse, or dependent) that leaves the program.   The adjusted cap will be compared with actual plan expenses at the end of the calendar year.   If claims exceed the adjusted cap, current Retirees will be expected to pay a pro rated monthly contribution.   In any year if actual Plan costs are less than the cap, there will be no contribution from Retirees and the Company shall not be required to pay more than the actual Plan costs or make any refunds.   In the event that the Federal government changes the Medicare program (or other government program for Retirees) in such a fashion as to affect these caps, the parties will meet promptly for the purpose of adjusting the caps to conform to the changes in the Medicare (or other

4

Article I - Section 7 Continued                SOCIAL INSURANCE

government) program. In no event shall an employee who is eligible for a Deferred Vested Pension qualify for any benefits under the Lyon Group Insurance Plan.

Section 8.   If a participating employee remains in employment with the Company following attainment of age seventy (70), the amount of insurance for death or dismemberment by accidental means shall be reduced in accordance with the formula for life insurance, as specified in Section 5 of this Article.

In any event, all group insurance for death and dismemberment by accidental means shall be cancelled upon retirement or termination of employment for any reason.

Section 9.   There shall be no increase in the amount of insurance for death or dismemberment by accidental means on or after a participating employee's seventieth (70th) birthday.

Section 10.  Differences between claimants and the processors of claims or the insurance company shall not be subject to the grievance procedure under the Basic Agreement or any other agreement between the parties.

Section 11.  The failure of the insurance company to provide for any benefit shall result in no liability to the Company; nor shall such failure be considered a breach by the Company of any of the obligations which it has undertaken by this or any other Agreement with the Union.

Section 12.  The Company will provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the Group Insurance Plan has been denied, setting forth the specific reasons for denial and written in a manner calculated to be understood by the participant.

In addition, the Company's Employee Benefits Committee shall afford reasonable opportunity to any participant or beneficiary whose claim for benefits has been denied, for a full and fair review of this decision by such Committee.

5

Article I – Section 13                          <u>SOCIAL INSURANCE</u>

Section 13.   The Company retains the exclusive right to select and/or to make changes in the insurance underwriter(s) and/or to establish some other arrangements which will provide the same program of benefits which are provided by this Agreement, as may from time to time be deemed desirable by the Company.

## ARTICLE II -- GENERAL PROVISIONS

Section 1.    Nothing contained in this Insurance Agreement shall be construed as a contract of employment between the Company and any employee, or as a right of any employee to be continued in the employment of the Company, or as a limitation of the Company's right to discharge, suspend or discipline any employee.

Section 2.    The parties hereto acknowledge that during the negotiations which resulted in this Insurance Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement.

Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement; provided, however, that negotiations or bargaining with respect to such matters may be voluntarily permitted by the mutual consent of the parties hereto.

Section 3.    The Company and the Union acknowledge that the federal Health Maintenance Organization Act of 1973 which became effective November 27, 1975, applies to the employees covered by this Insurance Agreement.

Under this law, a qualified Health Maintenance Organization(s) (commonly referred to a "HMO") may, under certain conditions, apply to the Company in writing asking to be accepted by the Company as an optional medical health benefits plan which may be selected by individual employees in lieu of the medical health benefits plan covered by this Insurance Agreement.

The Company shall not be required to seek out or develop an HMO option for its employees covered by this Insurance Agreement.

In the event that an HMO option is offered to its Employees, it is also agreed that the Company is not obligated to pay more for HMO services than the amount of the medical health benefits plan covered by this Insurance Agreement. If the HMO plan offers fewer benefits than those provided by the medical health benefits plan covered by this Insurance Agreement, the Company's contribution to the HMO shall be reduced proportionately.

Neither the Company nor the Union cedes any right which each may have under the Health Maintenance Organization Act of 1973 and/or to which it (they) may be entitled by any future federal legislation and/or regulations on this subject.

7

## ARTICLE III -- PERIOD OF AGREEMENT

Section 1.   This Insurance Agreement shall become effective on February 20, 2005, and shall continue in effect until 11:59 p.m. on February 14, 2009, and shall continue in effect from year to year thereafter, unless either party notifies the other party in writing sixty (60) calendar days prior to the anniversary date of its desire to modify, change, or terminate this Agreement.

Upon receipt of such written notice concerning a modification, change, or termination of this Agreement expiring on February 14, 2009, or on any anniversary date thereafter, the two parties shall meet within thirty (30) calendar days, unless otherwise mutually agreed, for the purpose of negotiating such issue. If negotiations are not completed within the sixty (60) calendar day period, this Agreement may be extended from time to time for the purpose of continuing negotiations and reaching final agreement.

Section 2.   In the event that the Basic Agreement between the Company and the Union is terminated, or in the event that either party or the employees resort to any strike or any lockout, as the case may be, during the term of this Insurance Agreement, this Agreement shall terminate at the beginning of such action; provided, however, that if and when the Company and the Union shall have reached an Agreement with respect to such action, this Insurance Agreement shall be reinstated and shall continue in effect as provided in Section 1 of this Article.

Section 3.   The Union agrees for itself and its individual members that during the term of this Agreement, neither the Union nor any of its officers, stewards, agents, representatives nor any member shall:

a.   Make any request that the Company increase hourly rates of pay of the employees on account of or for use in paying in the cost, in whole or in part, of any program of insurance benefits of the employees or of their dependents; or

b.   Make any request that the Company change the program of benefits available under this Agreement or increase its contributions toward the cost of any program of insurance benefits for employees or their dependents; or

c.   Instigate, authorize, call, support, maintain, engage in or continue to engage in, or in any manner encourage or sanction any strike, walk-out, work stoppage, interruption or slow down or impeding of work, boycott, or picketing of the Company's plant or premises for the purpose of securing any such increase or any such change or any other action with respect to insurance.

Article III – Section 3 Continued          PERIOD OF AGREEMENT

The Company agrees that during the term of this Agreement, it shall not engage in or sanction any lockout for the purpose of changing this Agreement.

Section 4.    The Company may terminate the employment or otherwise discipline any employee who foments, instigates, calls, supports, or participates in any act forbidden in Section 3c of this Article.

Section 5.    The Union agrees that it shall use its best efforts to prevent any act(s) forbidden in Section 3c of this Article on the part of any employee or group of employees, and that in the event that such acts take place by any employee or group of employees, the Union further agrees that it shall use its best efforts to cause an immediate cessation thereof.

Section 6.    It is understood and agreed that in the event any act forbidden in Section 3c of this Article was not instigated, authorized, called, supported or maintained by the International Union, the Local Union, or any of their officers, there shall be no liability on the part of the International Union, the Local Union, or any of their officers or agents, or members, except those officers or agents or members who participated in any of the acts forbidden by Section 3c of this Article, and as to such officers or agents or members the Company shall be limited in its recourse and remedy to such actions (including disciplinary measures) as it may have against them individually.

Nothing in this Section 6 shall restrict any right which the Company is or may be entitled to seek legal or other redress of any individual(s) who has caused damage to or injury to or loss of Company property, nor does the Company cede any rights in this regard to which it may be entitled by future legislation.

Section 7.    Any notices to be given under Article III of this Agreement shall be given by certified mail and shall be deemed to have been given at the time of mailing same.  If such notice is to the Union, it shall be addressed to the United Steelworkers of America, 7218 W. 91st Street, Bridgeview, IL 60455.  If such notice is to the Company, it shall be addressed to Lyon Workspace Products, L.L.C., P. O. Box 671, Aurora, Illinois 60507.  Either party may, by like written notice, change the address to which certified mail notice to it shall be given.

Signature page for Insurance Agreement dated February 20, 2005.

FOR LYON WORKSPACE PRODUCTS, L.L.C.

R. Peter Washington
Chairman & CEO

Matthew P. Washington
Vice President Manufacturing

Joseph G. Gosselin
Vice President Quality & Service

Margaret Q. Ciszewski
Vice President Employee Relations &
Risk Management

Charles Abens
Plant Superintendent

Carol A. Stathis
Human Resources Manager

FOR UNITED STEELWORKERS OF AMERICA, AFL-CIO

Leo W. Gerard, President

James D. English
International Secretary-Treasurer

Andrew V. Palm
Vice President - Administration

Leon Lynch
Vice President - Human Affairs

Jim Robinson
District 7 Director

Craig F. Langele
Sub-district 1 Director

Ed Bell, Staff Representative

Larry Beck
Chairman of Committee, Local 1636

Manuel Aponte, President, Local 1636

R.C. Pryor, Committeeman

Willie Walker, Committeeman

S.T. Pryor, Committeeman

Carlos Delgado, Committeeman

# EXHIBIT C

## SPD

## SUMMARY PLAN DESCRIPTION SUPPLEMENT
### for the Lyon Workspace Products, LLC Hourly Retirees Health Plan – PPO (the "Program"), a Component of the Lyon Workspace Products, LLC Self-Insured Medical Plan (the "Plan")

This is the supplement for the booklet entitled
"Lyon Workspace Products, LLC Hourly Retirees – Participating Provider
Option Group No. P79850, Section 0200, 0300, 0400."

Please note that salaried retirees, retirees not covered by the PPO, and all active
employees must refer to the booklet and supplement applicable to their group.

# TABLE OF CONTENTS

Page

SECTION 1:    OVERVIEW OF THE PLAN ........................................................... 1

SECTION 2:    CURRENT COST OF PROGRAM ................................................. 2

SECTION 3:    FUTURE COST SHARING .......................................................... 2

SECTION 4:    ELIGIBILITY ............................................................................... 3

SECTION 5:    SPECIAL ENROLLMENT DUE TO ACQUIRING A
              DEPENDENT .................................................................................. 3

SECTION 6:    SPECIAL CIRCUMSTANCES FOR REHIRED RETIREES ................. 4

SECTION 7:    TERMINATION OF COVERAGE ................................................... 4

SECTION 8:    CONTINUATION OF COVERAGE AFTER TERMINATION
              (COBRA) ....................................................................................... 4

SECTION 9:    CLAIMS PROCEDURES ............................................................... 6

SECTION 10:   QMCSO PROCEDURES ............................................................. 11

SECTION 11:   MINIMUM MATERNITY BENEFITS ........................................... 11

SECTION 12:   SUBROGATION AND THIRD-PARTY REIMBURSEMENT ............. 12

SECTION 13:   RIGHT TO INFORMATION ........................................................ 14

SECTION 14:   NO GUARANTEE OF EMPLOYMENT .......................................... 14

SECTION 15:   STATEMENT OF ERISA RIGHTS ............................................... 14

SECTION 16:   ADMINISTRATIVE INFORMATION ............................................ 16

### SUMMARY PLAN DESCRIPTION SUPPLEMENT
### for the Lyon Workspace Products, LLC Hourly Retirees Health
### Plan – PPO (the "Program"), a Component of the Lyon
### Workspace Products, LLC Self-Insured Medical Plan (the "Plan")

## SECTION 1:  OVERVIEW OF THE PLAN

The booklet entitled "Lyon Workspace Products, LLC Hourly Retirees – Participating Provider Option Group No. P79850, Section 0200, 0300, 0400" (the "Booklet") describes the retiree health care program that we provide to help protect you from the financial burden of catastrophic illness or injury.  This program, which is referred to as the Lyon Workspace Products, LLC Hourly Retirees Health Plan – PPO (the "Program"), is a component of the Lyon Workspace Products, LLC Self-Insured Medical Plan (the "Plan").

This supplement, with the Booklet, is the summary plan description, or "SPD," for the Program. This SPD is intended to clearly summarize a complex benefits program, not to alter or modify the Program; thus, if there are any inconsistencies between the SPD and the Program, the actual terms of the Program will apply.  This SPD may be modified from time to time by a Summary of Material Modifications (an "SMM") that will be issued by Lyon Workspace Products, LLC ("Lyon").  Any SMM related to the Program is considered to be part of this SPD.  To determine the benefits applicable to your situation at any given time, it is necessary to consult the SPD as it was in effect at that time.

The Program has been established for the exclusive benefit of eligible retirees.  Nothing in this SPD or the Plan is intended to commit the employer to provide permanent health benefits of any type to any class of employees or former employees.  It is intended that the Plan and the Program will be continued indefinitely; but, as is customary in group plans, the right to change or terminate the Plan or the Program in the future must be reserved.  Except as specifically provided in a collective bargaining agreement, Lyon reserves the right to amend, modify or terminate the Plan, including any benefits provided under the Program, or to change the amount of required contributions at any time and for any reason.  You will be notified of any changes to the Plan or the Program within a reasonable amount of time.  No amendment will reduce benefits payable for claims that are incurred prior to the date of such amendment.

Please read the information in this supplement and the related Booklet carefully so that you will have a full understanding of your health care benefits.  The Booklet generally describes the following:  eligibility and coverage under the Program; services covered by the Program, including inpatient hospital and physician services; coordination of benefits (in case you have coverage through more than one group program); cost of using the Program's benefits; and applicable procedures to receive payment for benefits.  If you want more information, or have any questions about your benefits under the Program, please contact the Human Resources Department.

This supplement addresses the following specific areas:  Lyon's right to amend and terminate the Plan; your eligibility to participate; special enrollment rights; special circumstances for rehired

retirees; current cost of the Program and future cost sharing; continuation of coverage after termination of coverage; claims procedures; the Program's rights to subrogation and third-party reimbursement; your rights under several important federal laws; and administrative information. In any section, if this supplement contradicts the Booklet, the provisions of this supplement will control.

## SECTION 2:  CURRENT COST OF PROGRAM

Below is a summary of the deductibles, out-of-pocket expenses, and your required percentage contributions toward monthly premiums.  More detail has been provided in the Booklet section entitled "Benefit Highlights" on page 4.  For purposes of the table below, "years of service" is defined in the pension agreement and the SPD for the Lyon Workspace Products, LLC Retirement Plan for Hourly Employees of the Aurora, IL Facility (the "Retirement Plan").

| Date of Retirement | Deductible for Individual/Family | Out-of-Pocket Per Individual | Contribution Toward Monthly Premium |
|---|---|---|---|
| Before 3/1/88 | $100/$200 | $500 | None |
| On and after 3/1/88 with 0-9 years of service | COVERAGE NOT AVAILABLE TO THIS GROUP | | |
| On and after 3/1/88 with 10-19 years of service | $300/$600 | $1,000 | 50% |
| On and after 3/1/88 with 20-29 years of service | $200/$400 | $750 | 25% |
| On and after 3/1/88 with 30 or more years of service | $100/$200 | $400 | None |

## SECTION 3:  FUTURE COST SHARING

Effective January 1, 1994, the dollar amounts of Lyon's contributions to retiree medical care costs were frozen.  This means that in any given year, Lyon will not pay any more than an annually adjusted cap for that calendar year for all medical benefit claim costs for all retirees (including salaried retirees, retirees from other plant locations, and Aurora hourly retirees).  In 1994, the cap was $750,000.  This figure has been adjusted each year by (1) adding $4,000 for each new retiree who enters the Program and (2) deducting $1,500 for each retiree, spouse or dependent who leaves the Program.

Effective January 1, 2002, $4,750 will be added for each new retiree entering the Program and $1,250 will be deducted for each retiree, spouse or dependent who leaves the Program.

At the end of each calendar year, the adjusted cap is compared to actual retiree plan expenses. If medical costs exceed the adjusted cap, all current retirees with coverage will be required to make a contribution to the Program in order to maintain coverage. You will be billed for this contribution and allowed to pay it over the next plan year; you will be allowed to choose semiannual, quarterly or monthly payments. In any year in which claim costs do not exceed the cap, there will be no contribution required, nor will there be any refunds from Lyon.

In the event that the federal government changes the Medicare program (or other governmental program for retirees) in such a way as to affect the cap, Lyon and union representatives have agreed to meet promptly for the purpose of adjusting the cap to conform to the changes in Medicare (or other governmental program).

## SECTION 4: ELIGIBILITY

Those eligible to participate in the Program must meet the criteria described in the Booklet section entitled "Eligibility Section" on page 21. Please note that because the Plan covers union retirees of Lyon and is maintained pursuant to the collective bargaining agreement entered into between Lyon and the United Steelworkers of America, Local 1636 (the "Agreement"), participants and beneficiaries may obtain a copy of the Agreement upon written request, and it is available for examination by participants and beneficiaries.

If you have a deferred vested pension benefit under the Retirement Plan, you are *not* eligible for any form of coverage under the Program. Individuals who are receiving long-term disability benefits from the Long Term Disability Plan for Hourly and Salaried Employees are eligible for coverage under the Program, as long as they continue to receive monthly benefits, and pay any required premiums to the Program. If you have any questions on how these provisions may affect you, contact your Human Resources Department.

## SECTION 5: SPECIAL ENROLLMENT DUE TO ACQUIRING A DEPENDENT

If you are a participant in the Program and during the year you acquire a new dependent by birth, marriage, adoption or placement for adoption, your spouse and/or dependent may be eligible for special enrollment. Please contact your Human Resources Department for additional details and limitations that may apply to special enrollment.

You must request special enrollment within 31 days of the relevant marriage and within 31 days of the relevant birth, adoption or placement for adoption. Enrollments following a birth, adoption or placement for adoption will be effective as of the date of the birth, adoption or placement for adoption. Any other enrollment will be effective as stated under the terms of the Program.

3

## SECTION 6:  SPECIAL CIRCUMSTANCES FOR REHIRED RETIREES

If you have retired under the Total and Permanent Disability provision of the Retirement Plan, but recover from your disability and are reemployed by Lyon, you will no longer be covered under the Program. Instead, you will be covered under a program that covers active employees (the "Regular Program"). If you are receiving benefits under the Retirement Plan other than those benefits under the Total and Permanent Disability provision and are subsequently reemployed by Lyon, you will continue coverage under the Program and will not be eligible for reenrollment in the Regular Program.

## SECTION 7:  TERMINATION OF COVERAGE

In addition to the explanation provided in the Booklet on page 23, you will also lose coverage under the Program if you commit fraud under the Program, as determined by Lyon; miss contributions to the Program; or do not provide the correct information or omit information when communicating with the Plan Administrator (see section 13 of this supplement).

## SECTION 8:  CONTINUATION OF COVERAGE AFTER TERMINATION (COBRA)

This section 8 of the supplement entirely replaces the section of the Booklet entitled "Continuation of Coverage After Termination (COBRA)" on page 67.

Under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), your enrolled dependents will be offered the opportunity to extend medical coverage temporarily at group rates after coverage under a health plan would otherwise end or if costs increase due to specific events. In general, the coverage that may be continued under COBRA is the same as the coverage that your dependents were enrolled in on the day before a qualifying event occurs. The following table illustrates the qualifying events and the corresponding continuation period.

| Who Can Continue Coverage | Qualifying Events | Maximum Continuation Period |
|---|---|---|
| Retiree's covered spouse and covered dependent child(ren) | Retiree's death<br><br>Retiree's divorce or legal separation | 36 months |
| Retiree's covered dependent child(ren) | Child(ren) no longer meet(s) the eligibility rules | 36 months |

In the event Lyon should file for bankruptcy, a retiree, retiree's covered spouse and covered dependent child(ren) would be eligible for up to 36 months of coverage.

4

A child who is born to you or placed for adoption with you during a period of COBRA continuation coverage may be added to your coverage. You must notify Lyon of the birth, adoption or placement for adoption within 31 days of such event. The child will have all of the rights that any other covered dependent would have under COBRA.

**Extended Spouse and Dependent Coverage in Event of Your Death and Company Notification**

If you die while the Program covers you, your covered dependents will continue benefits under the Program for six calendar months following the month in which your death occurs. After expiration of the six months mentioned above, your spouse and eligible children will be offered COBRA.

In the case of your death, after the extended coverage described above, your covered dependents will automatically be advised of their right to COBRA continuation coverage within 14 days of the date on which the COBRA administrator is notified by the Plan Administrator of the event. The Plan Administrator has 30 days to notify the COBRA administrator.

**Your Notification Responsibility**

Under the law, you or a family member has the responsibility to inform the Plan Administrator of a divorce or legal separation or that a child no longer meets the eligibility rules under the Program within 60 days of the later of the date of the event or the date on which coverage would end because of the event. When the Plan Administrator is notified that one of these qualifying events has happened, your dependents will in turn be notified within 14 days that they have the right to choose continuation coverage under the Program.

**Electing Continuation Coverage**

Under the law, your dependents have 60 days to elect continuation coverage from the later of (1) the date they ordinarily would have lost coverage because of one of the events described above or (2) the date of the notice of the right to elect continuation coverage. If your eligible dependents do not choose continuation coverage within that time period, your health coverage under the Program will end.

You do not have to show insurability to choose continuation coverage. However, continuation coverage under the law is provided subject to eligibility for coverage under the Program. Lyon reserves the right to terminate your dependents' continuation coverage retroactively if they are determined to be ineligible. Once continuation coverage terminates for any reason, it cannot be reinstated.

An eligible dependent who, during the election period, waives extended participation can revoke the waiver at any time before the end of the election period. Benefits will be provided retroactively to the date the waiver is revoked.

Unless otherwise specified, your spouse's election to continue coverage will be considered an election on behalf of all eligible dependents who would lose their coverage due to the same qualifying event.

An election on behalf of a minor child can by made by the child's parent or legal guardian. An election on behalf of an eligible dependent who is incapacitated or dies can be made by the legal representative, the spouse, or the estate (as determined by applicable law) of such eligible individual.

### Payment of COBRA Premiums

Covered dependents must pay a premium to Lyon of 102% of the applicable premium during the 36-month period of continuation coverage.

### Termination of COBRA Continuation Coverage

Coverage under COBRA continues until the earliest of:

- The end of the 36-month continuation period;
- The date Lyon no longer provides health coverage to any of its retirees;
- The date the required contribution is not paid when due; or
- The date your dependent first becomes covered after the date of his or her COBRA election under another group health plan that does not contain a preexisting exclusion that affects benefits.

### COBRA Claims

File a COBRA claim in the same manner as any other claim under the Program. Claims incurred during the 60-day election period will not be paid before you or your eligible dependent makes the first premium payment.

## SECTION 9:  CLAIMS PROCEDURES

Some of the Program's Claims and appeals procedures are discussed in the Booklet; however, detail on the types of Claims and timing of the appeals process is set forth below. If there are any inconsistencies between the Booklet and this supplement, the terms in this supplement will control. Also, a complete statement of the Program's Claims procedures is located in the Program document.

### Definition of Adverse Benefit Determination

For purposes of these Claims procedures, as well as the Claims procedures set forth in the Booklet on pages 24-33 and pages 71-78, an Adverse Benefit Determination is a denial, reduction or termination of a benefit or a failure to provide or make a benefit payment (in whole

or in part). This includes a denial, reduction, termination or failure to provide or make payment based on a determination of ineligibility. Adverse Benefit Determinations also include (i) a denial, reduction or termination of a benefit or a failure to provide a benefit or make payment (in whole or in part) resulting from use of the Medical Services Advisory Program (MSA), as described on pages 24-28 of the Booklet; the Claim Administrator's Mental Health Unit, as described on pages 29-33; utilization review; or precertification; and (ii) a failure to cover a supply or service on the grounds that it is experimental, investigational or not Medically Necessary or appropriate.

**Types of Medical Claims**

The following explanations apply to medical Claims filed under the Program. As you will see below, how the Claim Administrator must respond to your filed Claim, including the time permitted for such response, varies depending on the type of medical Claim filed.

Urgent Care

An "urgent care Claim" is a Claim for medical care or treatment in which failure to act quickly (i) could seriously jeopardize your life or health or your ability to achieve a full recovery or (ii) would, in the opinion of a physician with knowledge of your medical condition, subject you to severe pain that could not be adequately managed without the claimed care or treatment. If a physician with knowledge of your medical condition determines that a Claim is an urgent care Claim, the Claim will be treated as such under the Program. Otherwise, the Claim Administrator will determine whether a Claim is an urgent care Claim by applying the judgment of a prudent layperson with an average knowledge of health and medicine.

Once the Claim Administrator receives your urgent care Claim, the Claim Administrator will notify you of the benefit determination within 72 hours. If you do not provide sufficient information for the Claim Administrator to make a determination, the Claim Administrator will notify you, within 24 hours after the Claim is filed, of the specific information necessary to complete the Claim. You will have up to 48 hours to provide this information.

The Claim Administrator may notify you of a benefit determination orally within these time frames if it also provides you with a written or electronic notice of the determination within 3 days of the oral notice.

Ongoing Course of Treatment

If the Program reduces or terminates benefits that you are receiving through an ongoing course of treatment, this change is treated as an Adverse Benefit Determination, and the Claim Administrator will notify you in advance to allow you to appeal before your benefits are actually reduced or terminated.

If you would like to extend the course of treatment beyond the scheduled time, and your request is an urgent care Claim, the Claim Administrator will notify you of its determination within 24 hours after receiving your Claim. You must make such Claims for extension at least 24 hours prior to the expiration of the scheduled time or number of treatments.

Pre-Service Claims

A "pre-service Claim" is any Claim for benefits in which the Program conditions receipt of the benefit, in whole or in part, on advance approval of the benefit. For example, when you make a request for preapproval of a medical treatment or service or participate in the utilization review procedures under the Medical Services Advisory Program (see pages 24-28 of the Booklet) or the Claim Administrator's Mental Health Unit (see pages 29-33 of the Booklet), this is a pre-service Claim. After the Claim Administrator receives your pre-service Claim, the Claim Administrator will notify you of the benefit determination within 15 days, unless an extension of up to 15 days is necessary due to matters beyond its control. This notice of extension will state why the extension is necessary and the date the Claim Administrator expects to issue its determination. If an extension is necessary because you have failed to submit the information necessary to make a benefit determination, the notice will describe the specific information necessary to complete the Claim. You will be given 45 days to provide this information.

If you attempt to file a pre-service Claim and your Claim does not follow the Program's preapproval review procedures (see the MSA Procedure section on pages 26-27 of the Booklet, the Preadmission Review section on pages 29-30 of the Booklet, and the Mental Health Unit Procedure section on pages 29 and 31-33) of the Booklet you will receive notice from the Claim Administrator within 5 days. The notice will explain the proper procedures to be followed in filing a Claim. This notice may be oral unless you or your authorized representative request written or electronic notification. If the pre-service Claim is an urgent care Claim, the Claim Administrator will notify you of an improperly filed Claim within 24 hours (see above).

Post-Service Claims

A "post-service Claim" is any Claim that is not an urgent care Claim or a pre-service Claim. This includes Claims that are filed automatically when you show your ID card as well as Claims that you must file manually by completing and mailing the appropriate Claim form (see page 71 of the Booklet for details). After the Claim Administrator receives your post-service Claim, the Claim Administrator will notify you of the benefit determination within 30 days, unless an extension of up to 15 days is necessary due to matters beyond its control. If an extension is needed, the Claim Administrator will notify you during the initial 30-day period stating why an extension is necessary and the date the Claim Administrator expects to issue its decision. If an extension is necessary because you did not submit the information necessary to make a benefit determination, the notice will describe the required information and you will be given 45 days to provide the information.

**Claim Administrator's Determination**

Once the Claim Administrator receives your Claim, it will be processed as follows:

**Approved Claims**

If the Claim Administrator approves your Claim, the benefit payment will usually be sent directly to the hospital or physician. You will receive a statement telling you how much was paid. In some cases the Claim Administrator will send the payment directly to you or, in the case

of a Qualified Medical Child Support Order, to the designated representative as it appears on the Claim Administrator's records.

**Notice of Adverse Benefit Determination**

If the benefit determination is an Adverse Benefit Determination, the Claim Administrator will send a written or electronic notice that will:

- Be written in a manner calculated to be understood.

- Include the specific reason(s) for the Adverse Benefit Determination.

- Refer to the Plan and Program provision(s) on which the determination was based.

- Describe any additional material or information necessary for you to perfect the Claim and explain why it is necessary.

- Describe the Program's review procedures and the time limits applicable.

- If the Adverse Benefit Determination was made with respect to an urgent care Claim, describe the Program's expedited review process.

- Include a statement of your right to bring a civil action under ERISA after receiving a final Adverse Benefit Determination on appeal.

- Include a copy of any internal rule, protocol or criterion that was relied on in making the determination or indicate that a copy of such rule, protocol or criterion is available, free of charge, upon request.

- If the determination was based on Medical Necessity, experimental treatment or similar exclusion or limit, either explain the scientific or clinical judgment(s) made or make such a statement of explanation available free of charge.

**Appeal of an Adverse Benefit Determination**

To appeal the Claim Administrator's Adverse Benefit Determination of a medical Claim, you must, within 180 days of receiving the determination, notify the Claim Administrator that you wish to appeal. As described in the Booklet on pages 27, 32 and 72, you may send written notification to the Claim Administrator's applicable address.

You have the right to submit written comments, documents, records, and other pertinent information relevant to your Claim. You will be given, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your Claim.

The Claim Administrator will appoint an "Appeals Administrator" to review your Claim on appeal. The Appeals Administrator shall not be the individual or the committee that made the initial Adverse Benefit Determination nor a subordinate of that individual or committee. The Appeals Administrator will not give deference to the initial benefit determination and will take into account all comments, documents, records, and other information you submit relating to the Claim, without regard to whether the information was submitted or considered in the initial benefit determination. If the Adverse Benefit Determination was based on a medical judgment,

the Appeals Administrator will consult with a health care professional who has appropriate training and experience in the medical field. This health care professional will not be an individual who was consulted in connection with the initial benefit determination or the subordinate of any such individual. Finally, the Appeals Administrator will identify any medical or vocational experts whose advice was sought in making the Adverse Benefit Determination without regard to whether the advice was relied upon in making the benefit determination.

The appeal of urgent care Claims can be conducted on an expedited basis. If you desire an expedited appeal, you must notify the Appeals Administrator. This will allow the Appeals Administrator to transmit all information to you by methods such as telephone and facsimile. An expedited appeal is also available under the Mental Health Unit Procedure (see page 31 of the Booklet).

For urgent care Claims, the Appeals Administrator will notify you of the benefit determination within 72 hours of receipt of the appeal. For expedited appeal claims under the Mental Health Unit Procedure, the Appeals Administrator will notify you of the Program's determination within 24 hours of receipt of the appeal or no later than the last authorized day (see page 31 of the Booklet). For pre-service Claims, the Appeals Administrator will notify you of the Program's determination within 30 days of receipt of the appeal. For post-service Claims, the Appeals Administrator will notify you of the Program's determination within 60 days of receipt of the appeal. The decision of the Appeals Administrator is final and binding. A table summarizing the time limits is at the end of this section.

### Notice of Decision on Appeal

If the decision on appeal is also an Adverse Benefit Determination, notice of the Adverse Benefit Determination on appeal will:

- Be written in a manner calculated to be understood.

- Include the specific reason(s) for the Adverse Benefit Determination.

- Refer to the Plan and Program provision(s) on which the determination was based.

- Inform you that, upon request and free of charge, you are entitled to reasonable access to and copies of all documents, records, and other information relevant to your Claim for benefits.

- Notify you of your right to bring legal action under ERISA.

- Include a copy of any internal rule, protocol or criterion that was relied on in making the determination or indicate that a copy of such rule, protocol or criterion is available, free of charge, upon request.

- If the determination was based on Medical Necessity, experimental treatment or similar exclusion or limit, either explain the scientific or clinical judgment(s) made or make available, free of charge, such a statement of explanation.

| SUMMARY OF TIME LIMITS | | | |
|---|---|---|---|
| | Type of Health Care Claim | | |
| | **Urgent care** | **Pre-service care (non-urgent)** | **Post-service care** |
| **To make initial Claim determination** | 72 hours | 15 days | 30 days |
| **Extension (if proper notice is given and delay is beyond the Claim Administrator's control)** | None | 15 days | 15 days |
| **To request missing information from claimant** | 24 hours | 5 days | 30 days |
| **For claimant to provide missing information** | 48 hours | 45 days | 45 days |
| **For claimant to request appeal** | 180 days | 180 days | 180 days |
| **To make determination on appeal** | 72 hours | 30 days | 60 days |

## SECTION 10:  QMCSO PROCEDURES

In the event that you need a copy of the procedures governing Qualified Medical Child Support Orders ("QMCSOs"), you may obtain it upon request, without charge, from the Plan Administrator.  A QMCSO is an order by a court that directs Lyon to extend medical plan coverage to a retiree's child who might not otherwise be covered under this medical program. QMCSOs are usually issued for children who reside with a former spouse.  A QMCSO designates the affected child as an "alternate recipient."

## SECTION 11:  MINIMUM MATERNITY BENEFITS

Group health plan and health insurance issuers offering group insurance coverage generally may not, under federal law, restrict benefits for any hospital stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery or less than 96 hours following a cesarean section.  They also may not require that a provider obtain authorization from the Program or the insurance issuer for prescribing a length of stay in excess of the above periods.  However, federal law does not prohibit an attending provider of the mother or newborn, after consulting with the mother, from discharging the mother or newborn earlier than 48 hours (or 96 hours, if applicable) after delivery.

## SECTION 12:  <u>SUBROGATION AND THIRD-PARTY REIMBURSEMENT</u>

The Program is designed to help meet the actual costs for which you (or your covered dependent) are responsible when you (or your covered dependent) have expenses due to illness or injury. However, you (or your covered dependent) may incur an illness or injury caused by the act or omission of a third party, or a third party may be responsible for payment of the medical expenses. This may include, for example, if you are in an automobile accident. In such circumstances, you (or your covered dependent) may have a claim against that third party for payment of the medical expenses. A third party is any person or organization, including an insurer, other than you or your covered dependent.

The Program is not obligated to pay for expenses due to an illness or injury for which a third party may be liable or legally responsible. By accepting benefits under the Program for payment of an injury or illness caused by a third party, you (or your covered dependent) automatically assign to the Program any right to recover payments from any third party, including any payments the third party made to you (or your covered dependent).

The Program has a first-priority lien on any amount you (or your covered dependent) recover. The Program is granted this right of first reimbursement from any settlement proceeds and recoveries due to litigation, arbitration or any other legal proceeding, whether or not designated as payment for medical expenses and even if you (or your covered dependent) are not made whole (*i.e.*, compensated in full). This first-priority lien shall remain in effect until the Program is repaid in full.

The Program reserves the right to independently sue for recovery of any benefit payments, even if you (or your covered dependent) do not pursue a claim against a third party. Also, the Program reserves the right to join any action filed by or on behalf of you (or your covered dependent) in order to recover its benefit payments.

By accepting benefits under the Program, you (or your covered dependent):

- Agree to notify Lyon when a third party may be liable for any illness or injury covered under the Program. Failure to notify Lyon will suspend benefit payments for the applicable illness or injury. Such suspension will be lifted when you (or your covered dependent) sign the agreement discussed below.

- Automatically assign to the Program your (or your covered dependent's) rights against any third party when this provision applies.

- Agree to repay to the Program the benefits paid on your (or your covered dependent's) behalf out of any recovery made from the third party.

After you notify Lyon that a third party may be liable for medical expenses, or if Lyon believes a third party may be completely or partially liable for your (or your covered dependent's) illness or injuries, the Program may require you (or your covered dependent) to sign an agreement specifying that you (or your covered dependent):

- Recognize the Program's right to recover its payment for medical expenses from the third party who caused the injury or illness related to the benefit payments.

- Agree to execute and deliver such instruments as may be required and to do whatever is necessary to secure the Program's right of reimbursement and subrogation.

- Agree to cooperate fully with the Program in collecting from the person who caused the illness or injury. (If a claim is settled without protecting the Program's interests, your or your covered dependent's rights to full compensation will be lost.)

- Agree to refrain from any action or inaction that may prejudice the Program's ability to obtain recovery.

If you (or your covered dependent) do not reimburse the Program from any settlement, judgment or insurance proceeds, the Program may reduce any benefits for current or future medical expense benefits payable to or payable on behalf of you (or your covered dependent) until the Program has been fully reimbursed.

The Program's subrogation and reimbursement rights apply to any benefits paid by the Program on behalf of you (or your covered dependent) as a result of any injury or illness that results from a third party. The following entities or forms of insurance are examples of third parties that may be responsible for making payment:

- Any no-fault insurance.

- Medical benefit coverage under any automobile liability plan. This includes your, your covered dependent's or any third party's policy under which you (or your covered dependent) is entitled to benefits.

- Underinsured and uninsured motorist coverage.

- Any automobile medical payments and personal injury protection benefits.

- Any third-party liability insurance.

If you (or your covered dependent) recover amounts from the third party that exceed the benefit payments already made by the Program, the Program may reduce its payment of future expenses for the applicable injury or illness by the excess.

In the event the Program makes total payments that exceed the maximum amount to which you (or your covered dependent) are entitled, the Program shall have the right to recover the excess amount from persons to, for, or with respect to whom such excess payments were made, including, but not limited to, withholding payments otherwise available under the Program.

This reimbursement and subrogation section is intended to prevent the application of two legal rules – the "make whole" rule and the "common fund" rule. The Program has a right to reimbursement for any legal fees it expends in exercising its right to subrogation and

reimbursement. Also, the reimbursement to the Program required under this provision will not be reduced to reflect your (or your covered dependent's) costs or attorneys' fees incurred in obtaining compensation, unless separately agreed to in writing by the Plan Administrator in the exercise of his or her sole discretion.

The Program's rights under this section are limited to the extent to which the Program has made, or will make, payments for medical expenses and expenses to enforce its rights under this section.

## SECTION 13:  RIGHT TO INFORMATION

You must provide the Plan Administrator and the Claim Administrator with any information that they consider necessary to administer the Program. If the information that you give on an enrollment form or claim application is wrong, or if you omit important information, your coverage may be canceled or your Claim may be denied. If your address should change, or if a dependent or beneficiary's address should change, you must notify the Plan Administrator.

## SECTION 14:  NO GUARANTEE OF EMPLOYMENT

Participation in the Program does not guarantee your employment with Lyon or any of its subsidiaries or affiliates, nor does it guarantee your right to any benefit under the Program.

## SECTION 15:  STATEMENT OF ERISA RIGHTS

As a retiree eligible to participate in the Lyon Workspace Products, LLC Self-Insured Medical Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all Plan participants shall be entitled to:

- Examine, without charge, at the Plan Administrator's office and at other specified locations, such as work sites and union halls, all documents governing the Plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

- Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

- Continue health care coverage for yourself, your spouse or your dependents if there is a loss of coverage under the Plan as a result of a qualifying event. You or your dependents may have to pay for such coverage. You have the right to review this summary plan description and the documents governing the Plan or the rules governing your COBRA continuation coverage rights.

- Reduction or elimination of exclusionary periods of coverage for preexisting conditions under your group health plan, if you have creditable coverage from another plan. You should be provided with a certificate of creditable coverage, free of charge, from your group health plan or health insurance issuer when you lose coverage under the plan, when you become entitled to elect COBRA continuation coverage, when your COBRA continuation coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefits plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees (for example, if it finds your claim is frivolous).

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory, or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W.,

Washington, D.C. 20210.  You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## SECTION 16:  <u>ADMINISTRATIVE INFORMATION</u>

Name of Plan:

Lyon Workspace Products, LLC Self-Insured Medical Plan is the umbrella plan or wrapper plan that provides benefits to participants in the Program, known as the Lyon Workspace Products, LLC Hourly Retirees Health Plan - PPO.

Plan Sponsor, Plan Administrator and Agent for Service of Process:

Lyon Workspace Products, LLC
P.O. Box 671
Aurora, IL 60507
Ph:  (630) 892-8941
Attn:  Nancy McFadden

Employer Identification No.:

36-4399222

Plan Number:

501

Plan Year:

January 1 through December 31

Contributions:

The Plan is funded by general assets of Lyon.

Administration:

Contract administration

Type of Plan:

Health

Revised 01/06/2004

CH02/22250551.9

16

# EXHIBIT D

# March 16, 2007 Letter to Union

 **Lyon Workspace Products**
P.O. Box 671
Aurora, IL 60507-0671
Phone: 630/892-8941
Fax: 630/892-8966
www.lyonworkspace.com

March 16, 2007

Mr. Gene Szondy
United Steelworkers of America
8510 N. Knoxville Avenue
PMB #323
Peoria, IL 61615

Dear Mr. Szondy:

The purpose of this letter is to inform you about the Retiree Medical costs for 2006, as they relate to the annual "cap". Here are the 2006 results:

| | |
|---|---|
| Cost of Medical & Prescription Claims | $840,230.89 |
| Less 2006 Retiree Medical Cap | - $568,750.00 |
| **AMOUNT OVER CAP** | $271,480.89 |

According to our agreement, the amount that Retiree medical costs exceed the cap are to be shared by all Retirees on the Plan by paying a pro rated contribution. On December 31, 2006, we had 106 Retirees on the Plan, therefore, the monthly contribution will be $213.42. We plan to inform the Retirees in a letter being sent out March 16, 2007, with the first payment due in April 2007. The $213.42 per month payments will continue through March 2008.

In that regard, the cap for 2007 will be $555,750. For each Retiree that entered the plan, we added $4,750 and for each person (life) that left the Plan, we subtracted $1,250. Here are the results of the calculations for the 2007 Retiree Cap:

| | |
|---|---|
| 7 Retirees x $4,750 | $ 33,250 |
| 19 Lives Out x $1,250 | - $ 46,250 |
| Net Add to Cap: | - $ 13,000 |
| **2006 CAP** | $568,750 |
| **2007 CAP** | - $ 13,000 |
| | $555,750 |

If you have any questions or comments regarding the above, please contact Nancy McFadden.

Sincerely,

Carol A. Stathis
Human Resources Manager

CAS/ndm
cc:  Manuel Aponte
     Larry Beck
     Nancy McFadden

# EXHIBIT E

## March 2007 Letter



**Lyon Workspace Products**
P.O. Box 671
Aurora. IL 60507-0671
Phone: 630/892-8941
Fax: 630/892-8966
www.lyonworkspace.com

March 16, 2007

**TO:   ALL LYON WORKSPACE PRODUCTS, LLC RETIREE MEDICAL PARTICIPANTS**

As you may recall, the annual cap on Retiree Medical expenses for 2006 was $568,750. We have just received final claim figures for last year (2006), and the total actual claim cost of Retiree Medical was $840,230.89 ($464,667.38 Medical and $375,563.51 Prescription Drugs).

On December 31, 2006, Lyon Workspace had 106 Retirees on the Retiree Medical coverage, therefore, a yearly contribution of $2,561.04 will be required from each of you.

The new Retiree Cap contribution of $213.42 will begin with the April 2007 Retiree Cap contribution. These contributions may be paid monthly (12 payments), quarterly (4 payments), semi-annually (2 payments), or annually (1 payment) as follows:

Annual        - $2,561.04  (Due April 15, 2007)
Semi-Annual   - $1,280.52  (Due April 15 and October 15, 2007)
Quarterly     - $ 640.26   (Due April 15, July 15, October 15, 2007, January 15, 2008)
Monthly       - $ 213.42   (First payment due April 15, 2007)

The payment of the monthly contribution will be due by the 15th of each month, i.e., the first month's contribution is due **April 15, 2007**.

**It is very important that you understand that you must make the monthly contribution to maintain your coverage. You must remember when payments are due – no billing notice will be sent to you.** We will allow a 30 day grace period beyond the due date of the payment, but if payment is not received within that 30 day period, your medical coverage (which includes the prescription drug benefit) will be terminated, and will not be reinstated at any later date.

All checks should be made payable to Lyon Workspace Products, LLC and noted "Retiree Medical". Please send your check to:

Lyon Workspace Products, LLC
ATTN: RETIREE MEDICAL
P. O. Box 671
Aurora. IL 60507

A sheet of monthly payment coupons is also enclosed for your convenience.

March 16, 2007
Page 2

The $213.42 monthly contribution will be in effect for the months of April 2007 through March 2008. By that time, the medical and prescription drug costs for 2007 will be known and it will be determined if a contribution for the next 12 months will be necessary. In that regard, the annual cap for 2007 will be $555,750. The new cap for 2007 was calculated by adjusting the 2006 Retiree Cap of $568,750 for 7 new Retirees coming into the Plan and 37 people leaving the Plan. For each Retiree coming into the plan, $4,750 was added to the 2006 Retiree Cap, while for each person leaving the Plan, $1,250 was subtracted.

If you have any questions, please call me.

Sincerely,

Nancy McFadden
Senior Benefits Administrator

ndm
Enclosure

**NOTE:**     **THE $213.42 MONTHLY RETIREE CAP CONTRIBUTION IS IN ADDITION TO THE RETIREE MEDICAL CONTRIBUTION YOU ARE ALREADY PAYING.**

**YOUR NEW TOTAL MONTHLY CONTRIBUTION EFFECTIVE APRIL 1, 2007 IS:**

$ _433.19_

```
*****************************************************************
```

2006 RETIREE CAP PREMIUM | 2006 RETIREE CAP PREMIUM

DUE APRIL 15, 2007: $213.42 | DUE OCTOBER 15, 2007: $213.42

```
*****************************************************************
```

2006 RETIREE CAP PREMIUM | 2006 RETIREE CAP PREMIUM

DUE MAY 15, 2007: $213.42 | DUE NOVEMBER 15, 2007: $213.42

```
*****************************************************************
```

2006 RETIREE CAP PREMIUM | 2006 RETIREE CAP PREMIUM

DUE JUNE 15, 2007: $213.42 | DUE DECEMBER 15, 2007: $213.42

```
*****************************************************************
```

2006 RETIREE CAP PREMIUM | 2006 RETIREE CAP PREMIUM

DUE JULY 15, 2007: $213.42 | DUE JANUARY 15, 2008: $213.42

```
*****************************************************************
```

2006 RETIREE CAP PREMIUM | 2006 RETIREE CAP PREMIUM

DUE AUGUST 15, 2007: $213.42 | DUE FEBRUARY 15, 2008: $213.42

```
*****************************************************************
```

2006 RETIREE CAP PREMIUM | 2006 RETIREE CAP PREMIUM

DUE SEPTEMBER 15, 2007: $213.42 | DUE MARCH 15, 2008: $213.42

# EXHIBIT F

## May 2007 Letter



**Lyon Workspace Products**
P.O. Box 671
Aurora, IL 60507-0671
Phone: 630/892-8941
Fax: 630/892-8966
www.lyonworkspace.com

May 15, 2007

**To:**   **ALL LYON WORKSPACE PRODUCTS, LLC RETIREE MEDICAL**
         **PARTICIPANTS**

As you are aware, Lyon Workspace Products' (the "Company") contribution for the Retiree health plan is **frozen** per the language of the Insurance Agreement (the "Agreement") that is collectively bargained by the Company and USW Local 1636 (the "Union"). Each year a calculation is performed by the Company whereby the Total Cost of the Plan[1] is reduced by the Company's frozen contribution (Retiree Cap[2]) to determine what amount of money will be reimbursed to the Company by **current** retiree plan participants. You then receive a letter from Human Resources detailing the contribution you are required to pay in order to continue participating in the plan.

The Company recently completed an audit of the collections of Retiree Payments and Actual Claims Paid back to the year 2001. The results of that audit are below:

| | Actual Claims Paid | Communicated Claims Paid | Retiree Cap | Communicated Amount Over Cap | Payments Collected | Shortfall |
|---|---|---|---|---|---|---|
| 2001 | $1,026,568.00 | $ 984,002.00 | $588,000.00 | $ 396,002.00 | $355,027.69 | $83,540.31 |
| 2002 | $ 881,228.41 | $ 821,583.85 | $558,750.00 | $ 262,833.85 | $250,449.24 | $72,029.17 |
| 2003 | $ 894,564.18 | $ 890,829.68 | $542,500.00 | $ 348,329.68 | $312,489.06 | $39,575.12 |
| 2004 | $ 922,655.69 | $ 919,125.75 | $538,000.00 | $ 381,125.75 | $342,666.68 | $41,999.01 |
| 2005 | $1,032,288.07 | $1,022,950.91 | $545,000.00 | $ 477,950.91 | $397,382.84 | $89,905.23 |
| 2006 | $ 853,255.19 | $ 840,230.89 | $568,750.00 | $ 271,480.89 | TBD | $13,024.30[4] |
| 2007 | TBD | TBD | $555,750.00 | TBD | TBD | TBD |

At least three factors have been identified as contributing to the Shortfall: 1) participants leaving the program at times other than the beginning of the Cap Year[5]; 2) plan

---

[1] Total amount of benefits (for all Lyon Retirees) paid per calendar year (Insurance Agreement, Article I, Section 7)

[2] Capped at $750,000 in 1994 and adjusted during each year by adding $4,750 for each new retiree who enters the program (changed from $4000 in 2001), and deducting $1,250 for each retiree life (retirees, spouse, or dependent) that leaves the program (changed from $1,500 in 2001).

[3] (Actual Claim Cost - Claim Cost Communicated) + (Communicated Amount Over Cap – Amount Collected)

[4] Does not include Amount Collected Shortfall

[5] Cap Year runs April to March

2

participants not contributing to the retiree cap immediately upon entering the Plan; 3) improper deductions to the Actual Claims Paid. I will address each factor separately.

*Participants Leaving the Program*
Some of you choose to pay your portion of the cap at the beginning of the Cap Year in a lump sum payment. Others opt to pay their portion Semi-Annually, Quarterly, or Monthly. If a participant chooses one of the other payment options and subsequently leaves the program in the middle of a Cap Year, either due to death or choosing to opt out of the program, the balance of his/her required contribution to the Plan is left unpaid. Therefore the Company is not collecting all the money due for that year.

*Participants Entering the Program*
Although the Insurance Agreement states that those costs above the Retiree Cap amount are to be shared by all "current retirees", the Company has learned that this provision has been administered incorrectly. Some participants have been allowed to forgo paying their portion of the Retiree Cap for the first year of their participation in the program, depending on the month in which they retire. This has allowed some retirees to avoid paying their share of the cap, thus placing a higher financial burden on the other participants in the program. This practice is in conflict with the language of the Insurance Agreement and will be corrected immediately.

*Improper Deductions*
During the audit, it was discovered that certain amounts for additional insurance purchased by the Company and/or rebate programs in which the Company participates, were being improperly deducted from the total claims paid amount at the time of the cap calculation.

## CONCLUSION

The cumulative shortfall since 2001 is listed below:

| Year | Payment Collection Shortfall | Improper Deduction Shortfall | Total Shortfall |
|---|---|---|---|
| 2001 | $ 40,974.31 | $ 42,566.00 | $ 83,540.31 |
| 2002 | $ 12,384.61 | $ 59,644.56 | $ 72,029.17 |
| 2003 | $ 35,840.62 | $ 3,734.50 | $ 39,575.12 |
| 2004 | $ 38,459.07 | $ 3,539.94 | $ 41,999.01 |
| 2005 | $ 80,568.07 | $ 9,337.16 | $89,905.23 |
| 2006 | TBD | $ 13,024.30 | TBD |
| TOTAL | $208,226.68 | | $131,846.46 |
| | GRAND TOTAL | | $340,073.14 |

In an effort to avoid any shortfall in the future, effective with the next Cap Year, the previous year's shortfall will appear as a line item on the Retiree Cap Contribution letter that you receive from Human Resources. However, another substantial shortfall may

3

occur if the current participants choose to opt out of the program after the start of the Cap Year. Participants who remain in the program will have to reimburse the Company should such a shortfall occur again.

Also, effective June 15, 2007, all current retirees who participate in and benefit from the retiree health plan will be expected to begin contributing towards the Plan, regardless of when they retire.

For the current Cap Year (April 2007 – March 2008), the cumulative shortfall amount will be shared by all current retirees participating in the plan and will be added to the over the cap payment as follows:

| | |
|---|---|
| Total Shortfall: | $340,073.14 |
| 2006 Over Cap Amount Communicated: | $271,480.89 |
| Total Amount Owed: | $611,544.03 |
| Number of Current Participants: | <u>103</u> |
| **Total Annual Amount Due Per Participant:** | **$   5,937.32** |

The new contributions will be effective with the June 15, 2007 payment and will be paid as follows[6]:

| If You Normally Pay: | Amount Due | Payment Due Date |
|---|---|---|
| ANNUALLY | $3,376.28 | September 15, 2007 |
| | | |
| SEMI-ANNUALLY | $1,688.14 | June 15, 2007 |
| | $2,968.66 | October 15, 2007 |
| | | |
| QUARTERLY | $   844.07 | June 15, 2007 |
| | $1,484.33 | July 15, 2007 |
| | $1,484.33 | October 15, 2007 |
| | $1,484.33 | January 15, 2007 |
| | | |
| MONTHLY | $1,057.50 | June 15, 2007 |
| | $   494.78 | Monthly thereafter |

**It is very important that you understand that you must make your catch-up and continuing contribution to maintain your coverage.** You must remember when payments are due – **<u>no billing notice will be sent to you.</u>** We will allow a 30 day grace period beyond the due date of the payment, but if the payment is not received within that

---

[6] Assumes April 15, 2007 and May 15, 2007 payments were made, if applicable.

4

30 day period, your medical coverage (which includes the prescription drug benefit) will be terminated, and will not be reinstated at any later date.

At this point, the Company has been able to go as far back as 2001 to calculate the shortfalls listed above. It is believed that the total shortfall could be even higher if the program was audited back to its inception in 1994. The Company reserves the right to complete the audit to the inception of the Retiree Cap.

The cost of health care continues to rise each year for both you and the Company. The Company evaluates the retiree program year to year to select the provider with the best benefits for the least amount of cost. With that in mind, you may want to conduct a similar cost/benefit analysis to determine if you want to continue to participate in our plan. I encourage you to visit the Medicare website at www.medicare.gov to see what programs are available to you. These programs may result in your expenses for comprehensive medical coverage being lower than the cost for maintaining your coverage under the Company's Plan.

Sincerely,

Margaret C. Ciszewski
VP Employee Relations & Risk Management

cc:    Manny Aponte
       Larry Beck
       Gene Szondy

# EXHIBIT G

## July 2007 Letter



**Lyon Workspace Products**
P.O. Box 671
Aurora, IL 60507-0671
Phone: 630/892-8941
Fax: 630/892-8966
www.lyonworkspace.com

---

### IMPORTANT NOTICE – PLEASE READ

---

**Date:  July 20, 2007**

**To:  ALL LYON WORKSPACE PRODUCTS, LLC RETIREE MEDICAL PARTICIPANTS**

From May to July 2007 the Lyon Workspace Products, LLC Hourly Retirees Health Plan – PPO (the "Plan") experienced an unprecedented 39% drop in participation. Due to the significant decline in participants in the Plan, Lyon Workspace Products, LLC (the "Company") will be forced to recalculate the cost-sharing cap payments by current retiree participants in order to recoup the shortfall of payments generated by such a drastic reduction. Below please find the recalculated annual cap payment amount due:

| | |
|---|---|
| Total Amount Owed by Participants to Plan[1] | $611,544.03 |
| Less Amount Paid by Terminated Participants | ($22,040.60) |
| Current Amount Owed | $589,503.43 |
| Number of Current Participants[2] | 63 |
| **Total Annual Amount Due Per Participant** | **$9,357.20** |
| **Total Monthly Amount Due Per Participant** | **$779.77** |

We realize that a significant reduction in cost-sharing participants results in increased payments by remaining participants in the Plan. Unfortunately, this is unavoidable and may continue to occur should additional participants opt out of the Plan in the future. For that reason, we would like to once again encourage retiree participants to investigate alternative potentially lower cost Medicare carve-out programs.

Moving forward participants in the Plan will receive a monthly personalized statement of account with the next month's payment obligation listed. The first of these statements is included with this notice and is due on August 15th.

In the past, some of you have elected to make lump sum Quarterly, Semi-Annual, or Annual payments. If your statement indicates that you have a credit on your account (numbers that appear in parentheses in the Amount Due column), there is currently no payment due. The statement for payments due September 15th will be issued on or about August 20th. **It is very important that you understand that you must make your catch-up and continuing contribution to maintain your coverage.** If the payment is not received by the 15th of the month due, your medical coverage will be terminated and will not be reinstated at any later date. Please allow adequate time for mailing.

Should you decide to opt out of the Plan and you have a credit balance, please notify Human Resources prior to the Payment Due Date and your credit balance will be refunded immediately.

*Margaret C. Ciszewski*

Margaret C. Ciszewski

VP Employee Relations & Risk Management

# EXHIBIT H

## August 2007 Letter

 **Lyon Workspace Products**
P.O. Box 671
Aurora, IL 60507-0671
Phone: 630/892-8941
Fax: 630/892-8966
www.lyonworkspace.com

---

## IMPORTANT NOTICE – PLEASE READ

---

**Date:   August 21, 2007**

**To:   ALL LYON WORKSPACE PRODUCTS, LLC RETIREE MEDICAL PARTICIPANTS**

From July to August 2007 the Lyon Workspace Products, LLC Hourly Retirees Health Plan - PPO (the "Plan") experienced a further 73% drop in participation. Due to the huge decline in participants in the Plan, Lyon Workspace Products, LLC (the "Company") will be forced to recalculate the cost-sharing cap payments by current retiree participants in order to recoup the shortfall of payments generated by such a drastic reduction. Below please find the recalculated annual cap payment amount due:

| | |
|---|---|
| Total Amount Owed by Participants to Plan[1] | $611,544.03 |
| Less Amount Paid Through August 15 2007 | ($191,403.85) |
| Participant Credits Refunded | $19,318.64 |
| Current Amount Owed | $439,459.02 |
| | |
| Number of Current Participants[2] | 17 |
| **Total Annual Amount Due Per Participant[3]** | **$25,850.53** |
| **Total Monthly Amount Due Per Participant** | **$3,692.93** |

---

[1] From letter dated May 15, 2007
[2] As of August 15, 2007
[3] September 2007 – March 2008